**IN THE SUPREME COURT OF PENNSYLVANIA**
**EASTERN DISTRICT**

**CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, STEVENS, JJ.**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : No. 654 CAP |
| | : |
| Appellee | : Appeal from the Judgment of Sentence |
| | : entered on 09/06/2011 in the Court of |
| | : Common Pleas, Criminal Division of |
| v. | : Allegheny County at No. CP-02-CR- |
| | : 0005652-2009. |
| | : (Post sentence motions were denied on |
| RICHARD ANDREW POPLAWSKI, | : 03/06/2012) |
| | : |
| Appellant | : ARGUED: April 9, 2014 |

**OPINION**

MR. JUSTICE STEVENS                    DECIDED: December 29, 2015

This is a capital direct appeal from the judgments of sentence imposed following convictions on three counts of first-degree murder and related charges entered in the Allegheny County Court of Common Pleas. For the following reasons, we affirm the judgments of sentence.

On the morning of April 4, 2009, 21 year old Richard Poplawski ("Appellant") was asleep in his Pittsburgh home when his mother, Margaret Poplawski, awoke him with a screaming complaint that their dogs were urinating and defecating on the living room floor. N.T. at 1391, 1447-48. The two argued bitterly until his mother threatened to call police to have him removed from the home. N.T. at 1448.

Appellant warned his mother against doing so and went back to his bedroom as she began to place a phone call. N.T. at 1448. As he listened to his mother's

conversation with a 911 operator, he dressed himself in a level-three ballistics vest and other attire that he would later refer to as his "outfit for intended battle." N.T. at 1448. To complete the outfit he donned a belt designed to hold .357 ammunition and strapped down his Dan Wesson .357 magnum to his hip. N.T. at 1449. Other firearms, including a fully loaded AK-47 style Romarm semi-automatic rifle ("AK-47") and a 12-gauge shotgun loaded with alternating slug to buckshot ammunition, were propped up in the corner of his bedroom. N.T. at 1449.

At 7:05 a.m., Allegheny County 911 received Margaret Poplawski's report of a domestic dispute at her home and her request that Appellant be removed because they were arguing. N.T. at 61. Her voice was calm and she indicated that no violence or weapons were involved, although she confirmed that legal weapons were kept in the home. N.T. at 61. The dispatch conveyed "mother son domestic, wants her son out of the house, giving her a hard time, no weapons." N.T. at 62.

Margaret Poplawski returned to Appellant's bedroom and, seeing his preparations, expressed disbelief, saying "come on, you're not going to do this." N.T. at 1451. In his mind, Appellant would later tell authorities, he was saying to himself "come on with it," and he picked up his 12-gauge shotgun and walked out into the living room, where he could see a police officer at the threshold of the front entrance. N.T. at 1451-52.

Less than five minutes after receiving the dispatch, Pittsburgh Police Officers Paul Sciullo and Stephen Mayhle had arrived at the Poplawski home. It was Officer Sciullo whom Appellant first saw at the entrance, and he instantly fired his shotgun from the hip, striking down the officer with duty weapon still in holster. N.T. at 1452. This

first shot was executed with a "point and click" Appellant would later explain. N.T. at 1452. Appellant then attempted to use the pump action of the shotgun to fire buckshot, but the gun malfunctioned, so he quickly ran to the kitchen to clear the slug shell and chamber a new round. At this time, he heard Officer Mayhle calling for assistance, and Appellant emerged from the kitchen to exchange gunfire with Mayhle inside the house. Mayhle landed two shots, one to the chest but stopped by Appellant's vest and one to the leg, forcing Appellant back toward the kitchen. Unable to see the officer's position, Appellant started firing into the wall between the kitchen and dining room and the firing stopped, but he did not know if he had hit the officer. N.T. at 1454. He ran into his bedroom to grab his AK-47 and started toward the front door, where he saw Officer Sciullo lying motionless on his back at the threshold and Officer Mayhle lying outside at the bottom of the steps. N.T. at 1454.

Pulling up to the scene at that moment was an SUV driven by off-duty Pittsburgh Police Officer Eric Kelly. Officer Kelly had just completed his shift and picked up his daughter from work, and the two were nearly home when they heard the police radio report followed by the sound of gunfire from the Poplawski home, which was less than two blocks away. N.T. at 106-07. After dropping off his daughter, Officer Kelly arrived at the scene and was immediately met with gunfire from Appellant's AK-47. Appellant fired upon the driver's door before the injured officer exited, and he continued to fire as the officer stumbled his way to behind the rear wheel well, from where the officer drew his duty weapon and fired futilely in several directions. N.T. at 1455. Appellant left the porch to survey the rear of the property and, seeing nothing, returned to the front.

Unsure if Officer Sciullo was still alive, Appellant stood over the officer and fired a single AK-47 shot into his neck. N.T. at 1455. He turned his attention to Officer Mayhle and fired several shots into his prone body, just in case the officer "was playing opossum," N.T. at 1455-56, causing the officer to twitch with each strike. N.T. at 92. Appellant then fired upon an immobile Officer Kelly, who never returned fire. N.T. at 1456.

With no other activity around his house, Appellant attempted to confiscate Officer Sciullo's sidearm pistol, but he could not disengage the retention strap of the holster. N.T. at 1456. He then returned to his bedroom to discard the depleted 40 round magazine from the AK-47 and reloaded with a fresh 30 round magazine. N.T. at 1456.

Pittsburgh Police Officer Timothy McManaway arrived at the scene at 7:17 a.m. and saw the SUV with its driver's door open and Officer Kelly lying behind it, raising his hand. N.T. at 170. He ran to Kelly and managed to drag the officer to a safer position behind the SUV, but could not move him any further. Officer Kelly was bleeding heavily from wounds to his leg and torso, according to McManaway, but was able to speak for a short time before slipping into unconsciousness and losing a pulse. N.T. at 173-80, 245-52. McManaway also observed Margaret Poplawski at this time nervously smoking a cigarette and pacing outside the garage side of the home. She was not visibly armed. N.T. at 182. He yelled and motioned to her to leave the area when AK-47 gunfire coming from a window of the house was directed at him, tearing up the SUV and causing shrapnel to hit his face. N.T. at 175-76. McManaway returned fire and was shot in the left hand during the course of several exchanges. N.T. at 178-80.

Appellant's semi-automatic weapon kept rescuers at bay for over 40 minutes until an *ad hoc* rescue team comprising both S.W.A.T. and city police used a van draped with bulletproof vests to retrieve Officers McManaway and Kelly from the scene shortly after 8:00 a.m. N.T. at 184, 246. Just minutes later, S.W.A.T. personnel arrived in an armored vehicle and drove it up to the front of the house and were met with heavy gunfire for some time before the pattern changed to intermittent spurts of battle. N.T. at 367-73. Positioning of the armored vehicle to cover the location of Officer Mayhle enabled a rescue/recovery team to reach the fallen officer. Appellant had not been firing his weapon as the team approached, but "gunfire erupted" from his location when they prepared to lift Mayhle. N.T. at 373. No one was injured during the recovery, however. Eventually, a S.W.A.T. sniper positioned on a neighboring home's roof used a succession of seven or eight shots through the side wall to force Appellant from his strategic firing position deep within the room to a position closer to the window. N.T. at 433. At that moment, the sniper saw the barrel of Appellant's rifle protrude from the window and he struck it with a single round, disabling the rifle. N.T. at 434.

Shortly thereafter, Appellant called Allegheny 911 at about 9:35 a.m. and told the operator/dispatcher that he had run out of ammunition and was not shooting any more police officers. N.T. at 498. The call was transferred to the 911 supervisor, and eventually to a S.W.A.T. team negotiator on the scene, who construed Appellant's dealings as deceptive--at one moment saying he was "done shooting innocent police officers right now," and in the next saying "well, I just want to take one more shot" with his .357 revolver. N.T. at 527. When the negotiator asked him to simply toss the revolver out the window, which had no glass remaining in it at that point, Appellant

claimed he could not. N.T. at 529. He also claimed he could not put his hands up at the window and remained out of view inside the room. N.T. at 530. Appellant also expressed anger over his disabled AK-47 and threw it against a wall during the phone conversation. N.T. at 528. When asked about Officer Sciullo, Appellant said not to worry about him because he shot him with a 12-gauge and something else and the officer was dead. N.T. at 528. Eventually, the negotiator managed to arrange the manner of surrender and police officers entered the home and placed Appellant under arrest at 10:44 a.m. N.T. at 544-48.

Appellant was transported by ambulance to Pittsburgh's Presbyterian Hospital. Two ambulance crew members and a doctor made an initial assessment of Appellant's injuries and, once they prepared Appellant for transport, cleared Detective Brian Johnson to begin his interview with Appellant. Detective Johnson read Appellant his Miranda[1] rights from a prepared card he carried in his wallet, N.T. at 1312, and then asked if Appellant would talk without the presence of a lawyer. Appellant agreed to talk, but evaded questions with complaints that his flex-tie handcuffs were too tight, that he received too much medication when, in fact, no medication had been administered, and that the paramedic was leaning against him and touching his penis. N.T. at 1314-21. Once at the hospital, Appellant stopped Detective Johnson's interrogation by invoking his right to an attorney. N.T. at 52.

Appellant spent two hours in the trauma unit receiving treatment for a gunshot wound to his right leg, bruising on his left chest, and an abrasion on his face before he

---

[1] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

was moved to a room located in a secure unit of the hospital. N.T. at 65, 68, 140. He wore a cervical collar and received for his pain Tylenol and Oxycodone orally and Dilaudid intravenously,[2] medications that could cause drowsiness. N.T. at 76-77. Once staff placed him in the hospital bed and police handcuffed and shackled him to its frame, he said to a patient care technician who was washing his face that he did not wake up that morning wanting to kill people. N.T. at 1390. He asked her "how many cops did I kill?" When she said she did not know, he replied "not enough, I bet." N.T. at 1392.

He slept for some time and awoke to see two Pittsburgh police officers in the hallway guarding his room. He yelled to the officers "I'm sorry I killed three of your friends," N.T. at 1336, and, sometime later, "all you cops are cock suckers, like you're on a big power trip. I should have killed more of you." N.T. at 1343. When a nurse later arrived with a dinner tray, one of the officers entered the room with her and, noticing there was no table for the tray, suggested that the nurse could put it on his chair. Appellant responded "you motherfuckers aren't going to eat. That's why I kill you motherfuckers because of your power trips." N.T. at 1347. After Appellant ate and the officer returned to the hallway, Appellant said in a calm voice that the officer who shot him in the chest was brave and that only Appellant's ballistics vest stopped the bullet. "He could have ended it all," Appellant said. N.T. at 1348. He said the officers did not deserve what happened and that he would spend the rest of his life in prison "biting off dicks." N.T. at 1348.

---

[2] Appellant described his pain as an 8 or 9 on a 10-point scale. N.T. at 90, 94.

Appellant's room grew darker as evening came, so an officer turned on the overhead light in the short hallway leading into the room to better observe Appellant. N.T. at 1350. Appellant again screamed the invectives he had earlier directed at the officers. N.T. at 1350. He later yelled at the officer "I wish it was you that came to my door today." N.T. at 1351. The officers did not respond to Appellant's outbursts. N.T. at 1351.

The police officers eventually recommended to their supervisor that he staff the next shift with county deputy sheriffs, as it was the officers' opinion that Appellant was attempting to provoke hostilities between himself and police. N.T. at 1338. Accordingly, at 10:06 p.m., Sheriff's Deputies Troy Garrett and Brad Nevin began their shift and applied their handcuffs and shackles to Appellant before the officers removed theirs. Appellant asked if the deputies could dowse the light in the room, but the deputies cited their need to observe him. N.T. at 1372.

No other interaction took place until about 2:00 a.m., when Appellant complained that one of his handcuffs was too tight and asked if Deputy Garrett could loosen it. N.T. at 1372. The deputy agreed the handcuff was somewhat tight and he loosened it. N.T. at 1373. At that point, Appellant said he was sorry about what happened and that it all happened so fast. He remembered hearing his mother crying in the basement and the police officers screaming outside. N.T. at 1378. Without response from Deputy Garrett, who remained silent throughout, Appellant said he did not care for the direction in which the country was headed, but knew where he was going and that he deserved to go there. N.T. at 1374. He said he had always considered himself a fighter for liberty and a supporter of police, and he acknowledged that they had a hard job and that he did not

feel sorry for himself. N.T. at 1374, 1381. When Appellant had finished his comments he thanked Deputy Garrett for listening to him, and Deputy Garrett walked outside the room and took notes about what was just said. N.T. at 1376. He then called the major crimes divisions of the Pittsburgh Police Department to inform them that Appellant was volunteering facts about the shooting.

At approximately 3:00 a.m., a magisterial district judge arraigned Appellant in his hospital room, supplied him with a copy of the complaint, and advised him that until he received a public defender at the county jail it would be wise for him to remain silent. N.T. at 12. After that, Appellant spent the bulk of the night sleeping.

At about 7:00 a.m., Detective James Smith from the major crimes unit arrived at the hospital and met with Deputy Garrett outside Appellant's room. N.T. at 1436. As Deputy Garrett described Appellant's earlier actions and comments, Appellant caught Detective Smith's eye and nodded to him, so the detective walked toward him. N.T. at 1437. Appellant said he liked the current guards but disliked the previous pair, and he believed the hospital staff was mistreating him because of what he had done. N.T. at 1437. At these complaints, the detective began to walk out of the room to resume talks with Garrett and told Appellant he would call a nurse to the room. N.T. at 1437. Appellant stopped him by asking to see his arraignment papers and, upon seeing the complaint against him, stated that he did not intend to shoot the neighbors' houses. N.T. at 1438. Appellant then asked the detective his name and if he was with the police. Detective Smith offered his name, rank, and assignment, and Appellant said he wished to talk. Detective Smith advised that he had to get a pre-interrogation warning

form faxed from his office, first, because Appellant had invoked his right to remain silent and requested counsel.

The form was faxed at 7:21 a.m. N.T. at 1439. At 7:30, Detective Smith reentered Appellant's room while leaving the door open, uncuffed Appellant's right hand, and together with Appellant filled out the form. Appellant provided his biographical information and confirmed after each paragraph that he understood his rights by answering "yes, sir" and initialing the form each time. N.T. at 1440, 1442. At the end of the form, Appellant confirmed that he was willing to waive his rights and answer questions without the presence of a lawyer, again, by answering "yes, sir" and initialing the form where the detective had written his affirmative answer verbatim. N.T. at 1441. Appellant then signed the form.

With the Miranda waiver form signed, Detective Smith began the interview. Appellant first asked the detective to explain the charges related to his shooting neighboring homes. When the detective asked him if he was really interested in that part of the complaint, Appellant admitted he was more interested in talking about himself and his actions. N.T. at 1442.

He expressed surprise that he had only killed three police officers because he was sure he had killed at least four, thinking his two AK-47 shots had pierced the windshield of the S.W.A.T. vehicle that had pulled up in his yard. N.T. at 1442, 1459. He explained why his mother called 911 and described in great detail how he donned body armor and armed himself before the police arrived. N.T. at 1444-51. He provided a step-by-step account of how he took down each officer, what firearm he used each time, and where he and the respective officer were positioned when they engaged. N.T.

at 1452-57. His thought process as he approached and fired at Officer Sciullo, he said, was "trigger ready, shot cop, and it's on." N.T. at 1466. He admitted shooting a motionless Officer Sciullo a second time with the AK-47 and said he would have fired upon the rescue of Officers Kelly and McManaway if he had seen it. He must have been surveying the rear of his property, he said, when it took place: "I would have shot them if I saw them." N.T. at 1445-47. He also said he was thinking at the time he was firing upon the S.W.A.T. forces outside that he was glad no children lived on the block and that he was thinking about his neighbors, too. N.T. at 1465.

He described taking phone calls from friends during the stand-off, and even held a conversation with a credit card collection agency while he was firing his AK-47 out the window, telling the agency it was out of luck because he was in a shootout with police. N.T. at 1460. His statement covered the moment a gunshot took out his AK-47 and how he resorted to his .357 after that. N.T. at 1461. As he felt his strength diminishing because of the leg wound, he took off his vest and noticed the bruise to his left chest where Officer Mayhle had shot him. N.T. at 1462. He had contemplated suicide at that moment, he said, but decided on jail, instead, because he could read, friends could visit, and he could perhaps write a book. N.T. at 1464. He then called 911 to surrender. N.T. at 1463.

Appellant told Detective Smith at the end of his statement that he just wanted everyone to know how all this happened and that was why he wanted to tell the story. N.T. at 1463. After taking the statement, Detective Smith gave Appellant the opportunity to make corrections and confirm the accuracy of each paragraph before signing his initials in red pen throughout. N.T. at 1466-67. Appellant not only made

various corrections to grammar and spelling, he also scrutinized details as to the sequence and description of events. At one point, for example, Detective Smith had written "police arrived, stepped to corner [of bedroom] to pick up shotgun[,]" but Appellant changed it in his own hand to read "stepped to corner to pick up shotgun before police arrived." N.T. at 1470. He took the time to make other fine distinctions throughout the notes. N.T. at 1470-77. While reviewing the entirety of the notes, Appellant said "well, that doesn't sound very good for me." N.T. at 1467.

Once he finished, Appellant added his own initialed statement that said "[p]olice arrived much quicker than I expected. I was caught off guard. This led to a snap decision to shoot. Believed police were going to kill me regardless, due to firearms in the home at the ready." N.T. at 1468. After that, he wrote "red is mine" in reference to the color ink he used, signed his statement, dated it, and recorded the time of 10:06 a.m. N.T. at 1468. During this entire interview, access to Appellant's room was not denied, and medical staff had freely entered to perform their duties. N.T. at 1395, 1442.

Appellant was charged with three counts of criminal homicide, 18 Pa.C.S. § 2501(a), nine counts of attempted homicide, 18 Pa.C.S. § 901(a), nine counts of assault of law enforcement officer, 18 Pa.C.S. § 2702.1(a), and other related charges based on the events of April 4, 2009. On April 23, 2009, the Commonwealth issued notice of its intention to seek the death penalty. The trial court subsequently granted a defense motion for a change of venire, at which time this Court directed that jury selection take place in Dauphin County. A hearing was held on Appellant's motion to suppress, which the court denied in its order of September 20, 2010.

Trial commenced in Allegheny County on June 20, 2011, and on June 25, 2011, the jury returned with a verdict of guilty on all counts. The penalty phase began on June 27, 2011 and concluded on the following day. The jury voted unanimously to sentence Appellant to death, finding three aggravating circumstances (that the victims were police officers killed in the performance of their duties,[3] knowingly creating a grave risk of death to another person in addition to the victims,[4] and committing multiple murders[5]) and two mitigating circumstances (no prior convictions[6] and a dysfunctional and difficult childhood as coming under the "catch-all" provision[7]). Immediately following the jury's penalty verdict, three sentences of death were imposed. Post sentence motions were subsequently denied on March 6, 2012 and Appellant filed timely notice of appeal on March 22, 2012.

## I. Sufficiency of the Evidence

On appeal, Appellant has raised no argument regarding the sufficiency of the evidence. However, "in all capital direct appeals, this Court reviews the evidence to ensure that it is sufficient to support the first-degree murder conviction[.]" Commonwealth v. Sanchez, 36 A.3d 24, 37 (Pa. 2011). First-degree murder is an

---

[3] 42 Pa.C.S. § 9711(d)(1).

[4] 42 Pa.C.S. § 9711(d)(7).

[5] 42 Pa.C.S. § 9711(d)(11).

[6] 42 Pa.C.S. § 9711(e)(1).

[7] 42 Pa.C.S. § 9711(e)(8).

intentional killing, *i.e.*, a "willful, deliberate and premeditated killing." 18 Pa.C.S. § 2502(a), (d). In order to prove first-degree murder, the Commonwealth must establish that: (1) a human being was killed; (2) the accused caused the death; and (3) the accused acted with malice and the specific intent to kill. Id. The jury may infer the intent to kill based upon the defendant's use of a deadly weapon on a vital part of the victim's body. Commonwealth v. Johnson, 985 A.2d 915, 920 (Pa. 2009) (citing Commonwealth v. Baumhammers, 960 A.2d 59, 68 (Pa. 2008)).

In reviewing whether the evidence was sufficient to support a first-degree murder conviction or convictions, the entire trial record must be evaluated and all evidence considered. Id. In applying the above standards, we bear in mind that the Commonwealth may sustain its burden by means of wholly circumstantial evidence, and "the trier of fact, while passing upon the credibility of witnesses and the weight of the evidence, is free to believe all, part, or none of the evidence." Commonwealth v. Cousar, 928 A.2d 1025, 1032–1033 (Pa. 2007); Commonwealth v. Sanchez, 82 A.3d 943, 967 (Pa. 2013).

Instantly, the evidence of the Commonwealth and all reasonable inferences deduced therefrom, when taken in a light most favorable to the Commonwealth as verdict winner, see Commonwealth v. Murray, 83 A.3d 137, 151 (Pa. 2013), support the jury's verdict of first-degree murder in the deaths of Officers Sciullo, Mayhle, and Kelly. As recounted *supra*, the Commonwealth presented Appellant's highly detailed confession as to how he carried out his ambush-style attack upon Officers Sciullo and Mayhle when they arrived at his home. He killed Officer Sciullo with a shotgun blast to the head, and struck down Officer Mayhle with multiple rounds of shotgun and AK-47

gunfire. He gratuitously shot both officers additional times in the head and neck with his AK-47 as they lay motionless on the ground. He opened fire on Officer Kelly's SUV as it pulled up in front of his home, striking the officer's leg through the driver's side door, and fatally pierced the officer's vest with the same high-powered AK-47 ammunition as Kelly exited his vehicle. Neighbors identified the shotgun blasts as the first shots fired, and they witnessed Appellant shooting at the prone bodies of all three officers. Expert forensic testimony further substantiated the use of deadly weapons to vital parts of the officers' bodies. Accordingly, we hold that sufficient evidence was presented to permit a reasonable jury to conclude beyond a reasonable doubt that Appellant was guilty of three counts of murder in the first degree.

## II. Suppression

In his first briefed issue, Appellant levies a challenge to the trial court's evidentiary ruling deeming Appellant's incriminating, post-arrest statements to police admissible. His two-prong argument states, first, that police impermissibly failed to scrupulously honor his invocation of the right to counsel. The invocation was clearly and unequivocally made, Appellant emphasizes, when he eventually declared "I want my fucking lawyer" as Detective Johnson was interviewing him in the hospital emergency room. N.T. at 52. Although questioning ceased at this point, police maintained a coercive presence over the many hours in which he lay restrained in a hospital bed by standing outside his hospital room in plain sight, escorting all personnel entering his room, and periodically turning on the overhead lights during nighttime hours, he continues. He avers that this chronic pressure culminated with Detective Smith, summoned to the hospital after Appellant had broken his 16 hours of silence by

volunteering statements to a Sheriff's Deputy guarding his room, allowing Appellant to begin a conversation that led to his signing a <u>Miranda</u> waiver form and providing incriminating statements.[8]

The second prong of Appellant's argument for suppression denies that his incriminating statement was the product of a voluntary, knowing, and intelligent decision on his part. Pain and blood loss from the gunshot wound, fear and agitation expressed about likely consequences, perceived hostility from guards, and several administrations of intravenous pain killers, including schedule IV narcotics Oxycodone and Dilaudid over a 16-hour period, all worked in concert to deprive Appellant of the lucidity that had prompted him 16 hours earlier to invoke his Fifth and Sixth Amendment rights, he insists. By the time Detective Smith entered the room, Appellant's state of mind made him incapable of voluntarily initiating a conversation in which he could waive the constitutional protections afforded by his earlier invocation, he claims.

The Commonwealth responds that Appellant's first prong argument asserting a disregarded invocation asks this Court to do what it cannot do--upset the credibility determinations of the suppression court, within whose sole province it is to pass on the credibility of witnesses and the weight to be given their testimony. According to the Commonwealth, when viewing the evidence under the governing standard and scope of review, it is clear that police respected Appellant's invocation up until the time he

---

[8] Appellant offers additionally that the court erred in crediting Deputy Garrett's testimony that he abruptly abandoned his refusal to speak to officers and gestured with an inviting nod for Deputy Garrett to enter his room. If nothing else, he argues, his cervical collar would have made it physically impossible for him to do this. As such, he contends the court should have identified Deputy Garrett's role as the point at which wrongful breach of his invocation began.

voluntarily waived his right to counsel many hours later. Credited was testimony by the nursing staff and officers alike who explained that officers neither questioned Appellant nor responded to his many outbursts during the time his invocation was effective. Deputy Garrett entered Appellant's room only because Appellant asked him to loosen a tight handcuff, and Garrett remained silent when Appellant began to talk about the crime, his motivations, and his expression of remorse, the court found. While Detective Smith arrived because Garrett notified him about Appellant's new willingness to talk, Smith did not enter the room until Appellant motioned for him, and he advised Appellant that they could not converse because Appellant had requested an attorney. The court likewise accepted Detective Smith's testimony that it was only after Appellant said that he no longer wanted an attorney because an attorney could not change anything, and that he wanted to talk, that Smith Mirandized Appellant and took his statement.

The Commonwealth likewise posits that the record belies Appellant's second prong assertion that he was incapable of validly waiving his rights. His treating physician testified that he received medication that could cause drowsiness but would not have impaired his judgment. Furthermore, no witness described Appellant as incoherent or displaying confusion at any time, and Appellant's notations on the <u>Miranda</u> form and his written commentary supplied further evidence of a voluntarily made statement.

> In reviewing a suppression court's denial of a suppression motion, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, we are bound by these findings and may reverse only if the court's legal conclusions are erroneous. Nonetheless, we exercise plenary review over the suppression court's conclusions of law.

Commonwealth v. Johnson, 42 A.3d 1017, 1028 (Pa. 2012).

Where, as here, an accused invokes his Fifth Amendment rights[9] during a custodial interrogation but later provides an incriminating statement, this Court reviews the voluntariness of the accused's statement by examining whether authorities refrained from further interrogation "until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." Commonwealth v. Edwards, 903 A.2d 1139, 1150 (Pa. 2006) (citing Edwards v. Arizona, 451 U.S. 477, 484–85, 101 S.Ct. 1880, 1885, 68 L.Ed.2d 378 (1981)). See also Commonwealth v. Keaton, 45 A.3d 1050, 1067 (Pa. 2012) (invocation of Fifth Amendment right to counsel shields arrestee from further interrogation until counsel is present, unless arrestee initiates further conversation with police). In Commonwealth v. Hubble, 504 A.2d 168 (Pa. 1986), this Court held that a confession given after a defendant invokes his right to counsel need not be suppressed where the defendant: "(1) initiated 'further communication, exchanges, or conversations with the police', and (2) knowingly and intelligently waived the right to counsel." Id. at 175 (quoting Edwards, 451 U.S. at 485–86 n. 9, 101 S.Ct. at 1885 n. 9).

After careful review, we conclude that the record supports the lower court's findings of fact that led it to deny Appellant's motion to suppress. Testimony adduced from both suppression hearing transcripts established that Detective Johnson ceased

---

[9] In addition to the case-specific Sixth Amendment right to counsel, the United States Supreme Court has held that a separate, prophylactic right to counsel is encompassed in the Fifth Amendment to counteract the 'inherently compelling pressures' of custodial interrogation. McNeil v. Wisconsin, 501 U.S. 171, 176-77, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991) (citing Miranda, supra).

his interview with Appellant once Appellant invoked his right to counsel. N.T. at 10, 52. Approximately eighteen hours transpired from his invocation to his eventual renunciation, during which time, according to testimony credited by the suppression court in its exclusive role as finder of fact, law enforcement officers honored Appellant's invocation by remaining outside his hospital room except to escort hospital personnel and the magisterial district judge during arraignment, and by ignoring Appellant's invectives and other attempts to establish communication. When Deputy Garrett entered Appellant's room on Appellant's request that a handcuff be loosened, he listened when Appellant volunteered statements concerning his case, but he neither initiated the encounter nor conversed with Appellant, and he made notes only afterward. N.T. at 107-124.

Even after receiving the magisterial district judge's advice to maintain his silence until his lawyer was assigned, Appellant summoned Detective Smith into his room and expressed his desire to talk. N.T. at 7, 11-12. Again, the court credited Detective Smith's testimony that he stopped Appellant to inform him that they could not talk because Appellant had invoked his right to counsel. N.T. at 10. Only when Appellant then renounced his invocation and said he wished to speak did Detective Smith request a Miranda form be faxed to the hospital, go over the form with Appellant, and begin an interview. At the time of this interview, therefore, Appellant had been read his Miranda rights twice by two different law enforcement personnel and had been advised of his rights additionally by a magistrate. Moreover, testimony indicated Appellant was alert and perceptive during each of these advisements and again at the time he renounced his invocation, all of which occurred in a hospital setting. This record supports both the

suppression court's factual findings, which are binding on this Court, and its legal conclusion that Appellant freely decided to renounce his invocation of Fifth and Sixth Amendment rights in a hospital environment in which law enforcement officers honored his rights.

We draw the same conclusion with respect to Appellant's assertion that the totality of circumstances, with particular emphasis on the alleged mental effects of both the pain he was experiencing and the pain medication he received, rendered his statements involuntary. Simply because Appellant complained of pain and received pain medication that could cause drowsiness did not automatically invalidate his statements to police. The inquiry, instead, goes to whether his statements were "the product of an essentially free and unconstrained choice by its maker." Commonwealth v. Hallowell, 282 A.2d 327, 329 (Pa. 1971).

The credited testimony of his treating physician and nurses indicated that Appellant neither received medication that would impair his judgment nor showed signs of such impairment during critical times. N.T. at 77-78, 81-82. Instead, he spoke coherently, albeit with fear and agitation during the early hours of his admission, but these emotions waned with the passage of time leading up to his renunciation. N.T. at 63-65, 68, 99-100, 137. Testimony also demonstrated that Appellant was coherent and responsive during his hospital room arraignment, at which time he received the district judge's advice to remain silent. N.T. 4/6/10 at 11-12. Finally, his ability to complete the Miranda form correctly on his own and to make written contributions in his own hand to Detective Smith's notes, N.T. 2/5/10 at 17-24, demonstrated both his capacity to know what he was saying and his freely exercised will to say it. The sum of this evidence,

accepted by the court, pointed to a proper renunciation and statements voluntarily made. Accordingly, the suppression court did not err in refusing to suppress Appellant's written and oral statements.

### III. Admission of Racial Epithets

In his next issue, Appellant contends that reversible taint in both the guilt and penalty phase resulted from the trial court's erroneous evidentiary ruling, over defense objection, permitting the jury to hear excerpts of Appellant's 911 call in which he uttered racial epithets that were irrelevant and highly prejudicial.

In his 911 call Appellant used the slur "nigger" several times. At trial, the court granted defense counsel's request that the jury hear the entire forty-one minute recording of the 911 call made by Appellant. N.T. at 524. From that recording, several excerpts were made exhibits and entered into evidence, as well. The first 911 call excerpt accompanied the testimony of dispatcher Kathleen Cornell and offered the following from Appellant:

> **APPELLANT:** I'm done taking innocent police officers' lives. So, if someone can come and get me, that would be great.
>
> **DISPATCHER:** Do you have any weapons on you?
>
> **APPELLANT:** I got plenty of weapons on me, but I'm not shooting any more cops because my weapons are out of ammunition and disabled.
>
> **DISPATCHER:** You're out of ammunition?
>
> **APPELLANT:** Almost, but I promise you that I'm not going to shoot any more fucking police officers.

N.T. at 496-97; see also N.T. at 1501; Commonwealth Exhibit 93.[10] Also played as Exhibit 94 were remarks accompanying the testimony of 911 Call Center shift commander Robert Sabo:

> **APPELLANT:**     Richard Poplawski.  I'm inside 1016 Fairfield Street.  Okay.  I don't want to end any more innocent officer's [sic] lives in the line of duty.  Okay.  Okay.  [A]nd unless you want to send somebody in here.  I'm shot.  (inaudible)  And you know, I'm going to go to jail and fight the niggers for the rest of my life."  Send somebody with a nice voice into the fucking living room, which is the main room with the big window, and I'll explain to them we're basically done for the--.

N.T. 507; Commonwealth Exhibit 93A, "side B," at 12:41.  The third excerpt was admitted as Exhibit 95 and contained surrender negotiations between Sergeant Campbell and Appellant, in which Appellant said, *inter alia*, it "ain't no bullshit about what happened and I will have to bite the niggers' dicks off and fight for the rest of my life."  Commonwealth Exhibit 93A, "side B," at 18:15.

Prior to playing the entire recording and admitting these excerpts, the trial court issued the following cautionary instruction:

> **THE COURT:**     For the record, ladies and gentleman, this is -- before you put the headsets on, this is another one of these supplemental instructions.  Keeping in mind that you are to be the judges of the facts and be fair and dispassionate and impartial in all matters.  You will hear statements attributed to the defendant in this tape-recording that contain racial epithets.  These are gratuitous comments made in the context of the conversation and the events occurring at the time.  Because they are

---

[10] Exhibits 93, 94, and 95 represented segments taken from one entire recording, which was admitted separately as Exhibit 93A, "side B."  Redacted from the recording played during Cornell's testimony was Appellant's statement "I'm going to go to jail and fight niggers for the rest of my life."  This statement did, however, appear on Commonwealth Exhibit 93A, side "B" at approximately the 12-minute mark during Cornell's call, and a second statement to that effect was included in the playback of dispatcher Robert Sabo's call at Exhibit 94, as indicated *infra*.

prejudicial racial comments, you must not allow them to stir up your emotions to the prejudice of the defendant. You must not regard this evidence as showing that the defendant is a person of bad character from which you might be inclined to infer that he's guilty of any of the crimes charged here.

If you ultimately find the defendant guilty of any offense, it must be based upon evidence of proof by the Commonwealth beyond a reasonable doubt and not on the basis of any offensive language from which you might infer a racist attitude. You may proceed.

N.T. at 496.

Appellant argues that the racist comments were irrelevant to proving the case of first-degree murder and, accordingly, lacked any probative value to offset their highly prejudicial effect. As such, their exclusion was required under then-effective former Rules 401 and 403 of the Pennsylvania Rules of Evidence, he submits.[11] In this vein, Appellant notes that the trial court initially sustained his relevance-based objections to the epithets but changed its ruling and deemed them admissible--despite maintaining they were of questionable relevance--for their contextual value. Specifically, the trial court advised why it was changing its ruling:

> **THE COURT:** The problem is not that it is relevant. Clearly I would agree with you that there is a very difficult issue as to whether it's relevant or not. But the problem is it appears to be contextual, meaning it's there in

---

[11] At the time the trial court made its evidentiary rulings, this Commonwealth defined relevant evidence as that "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Former Pa.R.E. 401, rescinded and replaced Jan. 17, 2013, effective March 18, 2013. Under former Rule 403 in effect at the time of trial, relevant evidence was subject to exclusion "if its probative value [was] outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Former Pa.R.E. 403, rescinded and replaced Jan. 17, 2013, effective March 18, 2013.

> virtually everything that's going on and being said. But there are several cautionary instructions, one dealing with inflammatory photographs, one dealing with evidence of other crimes which have melded together, and I've got about a paragraph and a half here that I can tell them essentially that they are not to regard the evidence as…[court's comment ends without explanation].

N.T. at 360. Appellant dismisses this reasoning also as having no support in former Rule 401, which predicated the admissibility of evidence on relevance to a material fact.

Appellant continues that whatever contextual role the epithets could have theoretically played in assisting the jury in rendering a verdict was all but negated by admission of his written confession as well as by the substantive 911 statements reflecting his consciousness of guilt. Indeed, redaction of the quintessentially inflammatory slur "nigger" would have sacrificed nothing of value from the otherwise incriminating telephonic evidence, he contends.

The court's error was, furthermore, not harmless, Appellant continues, as the profound prejudice associated with revealing Appellant to be a racist can hardly have been rendered comparatively insignificant by the properly admitted evidence of his guilt. This was particularly so in the penalty phase, Appellant contends, where the prosecutor relied on a theme of Appellant as a "hater" who acted on his hate with devastating consequences and may very well do so again if allowed to live out his life in jail. The jury was, therefore, invited to punish Appellant for his belief system as well as for his actions, Appellant's argument goes.

The Commonwealth counters that the epithets were integral to the cohesiveness of Appellant's statement, and that their excision would have left the jury with the difficult task of piecing together broken language segments offered in an inculpatory statement that stood as crucial proof of first-degree murder. It is in that way the regrettable

remarks were of vital contextual importance, it maintains. "The issue is whether these highly germane admissions, [such as 'I'll have to fight for my life for the rest of my life'] could have reasonably been divorced from the word 'nigger' in such a way as to preserve their relevance and evidentiary integrity[,]" the Commonwealth posits. Brief for Appellee at 32. In a case involving multiple counts of murder, attempted murder, and other egregious offenses, it was imperative for the court to admit the "exact words" in which Appellant acknowledged he took the lives of "innocent police officers" and should lose his freedom for life, the argument continues. All the words together, therefore, demonstrated the malevolence and intent behind these unprovoked crimes, the Commonwealth insists.

In furtherance of its position, the Commonwealth cites to extra-jurisdictional authority for the proposition that racial epithets should avoid redaction where they are important to the finder of fact's understanding of the material conversations in which they were made. In U.S. v. Price, 13 F.3d 711 (3d Cir. 1994), the Commonwealth reports, the Third Circuit Court of Appeals reviewed a drug distribution conspiracy case in which the trial court denied a defense request to delete from tape recordings of the defendant his references to rival gang members as "niggers." The circuit court agreed that it would have been "virtually impossible" to redact this term without altering the substance of the conversation regarding the drug conspiracy, and so upheld the decision to admit the evidence. Id. at 720-21.

For its part, the trial court discusses neither the relevance of the epithets nor their relative probity as compared to potential for prejudice. Instead, it confines its opinion to say that Appellant offers nothing to rebut the presumption that juries follow cautionary

instructions, and that, at the worst, any error in the evidentiary ruling was harmless given the overwhelming evidence of Appellant's guilt in this brutal crime: "[t]he suggestion that because the jury heard the defendant utter racial epithets their [sic] ability to render a fair verdict was impaired is absurd." Trial Court Opinion, dated November 5, 2012, at 33.

The admissibility of evidence is a matter for the discretion of the trial court and a ruling thereon will be reversed on appeal only upon a showing that the trial court committed an abuse of discretion. Commonwealth v. Sherwood, 982 A.2d 483, 495 (Pa. 2009). "An abuse of discretion may not be found merely because an appellate court might have reached a different conclusion, but requires a result of manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support so as to be clearly erroneous." Id. (quoting Commonwealth v. Dillon, 925 A.2d 131, 136 (Pa. 2007) (citation omitted)).

In the event of an erroneous admission of evidence, a verdict can still be sustained if the error was harmless. See Commonwealth v. Wright, 961 A.2d 119, 144 (Pa. 2008). An error is harmless if it could not have contributed to the verdict, or stated conversely, an error cannot be harmless if there is a reasonable possibility the error might have contributed to the conviction. Id. We have found harmless error where:

> "(1) the error did not prejudice the defendant or the prejudice was *de minimis;*
>
> (2) the erroneously admitted evidence was merely cumulative of other untainted evidence which was substantially similar to the erroneously admitted evidence; or
>
> (3) the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict."

Id. *(quoting* Commonwealth v. Young*,* 748 A.2d 166, 193 (Pa. 1999) (citation omitted)). The Commonwealth has the burden of proving harmless error beyond a reasonable doubt. Id. at 143.

Here, any error in including the epithets in the otherwise highly relevant and probative 911 call recording of Appellant's statements was insignificant compared to properly admitted evidence overwhelmingly establishing that Appellant intentionally and fatally shot three police officers without provocation. He prepared for their arrival by donning body armor and arming himself with several firearms, struck down the first officer, Officer Sciullo, at the front entrance while the officer's gun was still in its holster, and overtook Officers Mayhle and Kelly with multiple weapons. He continued to spray gunfire at anyone who moved outside the home and prevented attempts to render aid to Officer Kelly, who lay dying on the front sidewalk. As this brutal exhibition played out at his home, Appellant telephonically admitted more than once in clearly stated fashion that he killed "innocent police officers" during the episode and was prepared to go to prison for the rest of his life for having done so. Nearly 24 hours later, he volunteered a written admission to the same effect in a constitutionally sound custodial interrogation. Neither identity nor the specific intent to kill was ever seriously challenged at trial. This was not a close case. See Wright, supra at 144.

The jury, therefore, heard such overwhelming evidence of both guilt on which to base its verdict and aggravating circumstances on which to base its sentence that not even this all-too-familiar epithet with the potential to incite passion among reasonable people could have factored in its guilt or penalty phase deliberations. Juries are presumed to follow instructions, Commonwealth v. Freeman, 827 A.2d 385, 409 (Pa.

2003); Commonwealth v. Carter, 643 A.2d 61, 77 (Pa. 1994) (trial court instruction to jury not to consider prosecutor's statements as evidence cured any prejudice which may have been caused by comments), and the court specifically advised jurors they were not to draw an adverse character inference from the two references. Thus, we conclude that any error attending the inclusion of Appellant's use of epithets in an otherwise highly relevant statement was harmless.

### IV. Discovery Violations

In his next briefed issue, Appellant contends the court erred in repeatedly permitting Commonwealth experts to testify beyond the scope of their respective pre-trial reports, thus constituting a discovery violation under Pa.R.Crim.P. 573(E), *infra*, which, *inter alia,* provides that the court may prohibit a party from introducing evidence not properly disclosed in pre-trial discovery. Each expert, Appellant says, agreed during testimony on cross-examination that his report did not contain the opposed opinions, and in so admitting revealed a clear strategy by the Commonwealth to conduct trial by surprise. Appellant asserts a manifestly unfair process resulted, especially in one instance when the objected-to opinion related to a matter that Appellant had specifically asked about during discovery only to be told it would not be raised at trial. In that regard, Appellant moved for mistrial, which motion the court denied.

Moreover, Appellant submits that the court's basis for admission in many instances--that the evidence was fairly basic and should have been anticipated and easily understandable--actually called for its exclusion under the standard predicating admission on the need to explain complicated evidence that what would otherwise be outside the ken of the jury. If the evidence at issue here was easily grasped, then it

should not have been presented by expert witnesses, Appellant argues. Resulting was unfair surprise impeding defense counsel's ability to prepare adequate expert defense, Appellant submits.

Pennsylvania Rule of Criminal Procedure 573 governs pre-trial discovery and provides in relevant part as follows:

(B) Disclosure by the Commonwealth.

(1) *Mandatory.* In all court cases, on request by the defendant, and subject to any protective order which the Commonwealth might obtain under this rule, the Commonwealth shall disclose to the defendant's attorney all of the following requested items or information, provided they are material to the instant case. The Commonwealth shall, when applicable, permit the defendant's attorney to inspect and copy or photograph such items.
....

(e) any results or reports of scientific tests, expert opinions, and written or recorded reports of polygraph examinations or other physical or mental examinations of the defendant, which are within the possession or control of the attorney for the Commonwealth;
....

(E) Remedy. If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this rule, the court may order such party to permit discovery or inspection, may grant a continuance, or may prohibit such party from introducing evidence not disclosed, other than testimony of the defendant, or it may enter such other order as it deems just under the circumstances.

Pa.R.Crim.P. 573.

The admission of expert testimony is a matter of discretion for the trial court, and will not be disturbed absent an abuse of discretion. Commonwealth v. Walker, 92 A.3d 766, 772 (Pa. 2014). An abuse of discretion "is not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will, as shown by the evidence or the record, discretion is abused." Id. at 772-73 (citation omitted).

Expert testimony is admissible in all cases, civil and criminal alike, "when it involves explanations and inferences not within the range of ordinary training knowledge, intelligence and experience." Id. at 788 (quoting Commonwealth v. Leslie, 227 A.2d 900, 903 (Pa. 1967)). Even where an expert's testimony arguably went beyond the scope of his or her report, the defendant still bears the burden of proving he suffered prejudice from the admission of the testimony. See Commonwealth v. Henry, 706 A.2d 313, 326-327 (Pa. 1997). The trial court has broad discretion in choosing the appropriate remedy for a discovery violation. Commonwealth v. Jones, 668 A.2d 491, 512 (Pa. 1995).

First, Appellant complains that the expert report of Allegheny County Chief Medical Examiner Dr. Karl Williams, who conducted the autopsy of Officer Michael Kelly, indicated that the locations of injuries and directions of projectiles were based on standard anatomical position without offering any opinion about which wounds came first or how Officer Kelly was positioned when hit. N.T. at 263, 292. At trial, however, when the Commonwealth asked Dr. Williams if he could determine which "grouping of gunshot wounds on Eric Kelly's body were administered first," defense counsel's objection was overruled. The trial court had initially sustained objections to testimony regarding the order of specific wounds received, but at trial it allowed Dr. Williams to infer from the alignment of bullet holes in the driver's side door of Kelly's SUV with the gunshot wounds in his leg that Officer Kelly received this grouping of gunshot wounds as he sat in the driver's seat, and it allowed him to then opine further that Kelly received the directly fatal gunshot wound to his torso as he exited the vehicle. Dr. Williams' report had identified this as the "most inevitably fatal" shot.

Appellant argues that the absence of these observations from Dr. Williams' report deprived him of the opportunity to prepare expert rebuttal as to the order of wounds. He fails, however, to carry his burden of explaining how this admission of evidence prejudiced his defense. Examination of the entire record reveals that Dr. Williams' testimony merely corroborated unrebutted eyewitness accounts that Appellant initiated gunfire on Officer Kelly, who fell to the ground immediately after first alighting his vehicle and remained incapacitated there. The crime scene investigation, as well, noted the incapacitated officer lay on the sidewalk next to his SUV for an extended time as Appellant's gunfire prevented paramedics and fellow officers from offering aid. The uncontradicted evidence admitted elsewhere during trial overwhelmingly established that he fired the fatal shot while Officer Kelly was just exiting his vehicle. Unsupported by a showing of prejudice, this claim fails.

Appellant next contends that Allegheny County Associate Medical Examiner and Forensic Pathologist Dr. Todd Luckasevic also testified to opinions not in his report when describing the autopsy of Officer Mayhle. The defense objected when the prosecution asked Dr. Luckasevic if he could opine on the position of Officer Mayhle at the time he received a fatal gunshot wound that entered his face and severed his cervical spine. At side bar, defense counsel asked for an offer of proof, and the prosecutor replied that she expected the doctor to say the officer was either standing, sitting up, or directly underneath the shooter because those would be the three possibilities based on the essentially level trajectory the bullet had taken once it entered the face. N.T. at 567. Defense counsel protested that, again, this opinion was not in the doctor's report, nor was it offered when defense counsel interviewed the doctor six

months earlier, and she decried the prosecutor's practice of relying on "surprise opinions" to make its case. N.T. at 567. The court disagreed that the question would produce a surprise opinion, noting that "I don't think you have to be a forensic pathologist to figure out if the bullet goes straight, you either have to be standing up, sitting down, or on the ground…this is pathology, but it isn't rocket science, so the objection is overruled." N.T. at 567.

Review of the trial transcript shows that Dr. Luckasevic determined from his examination that the bullet entering Officer Mayhle's face traveled at a slightly downward trajectory from front to back, dropping about three-quarters of an inch along that pathway as it severed his cervical spinal cord. N.T. at 568. When asked by the Commonwealth what position the officer must have been in to sustain that wound path, Dr. Luckasevic responded that because many positions would be consistent it was a difficult question to answer. The doctor recommended, instead, that he could offer an opinion as to whether the wound was consistent with a particular scenario. N.T. at 568. The Commonwealth then supplied a hypothetical based on Exhibit 76, a crime scene photograph depicting Officer Mayhle's body lying face up on a concrete slab. Assuming that the concrete was beveled out underneath the officer's head, the prosecutor asked the doctor if he could determine the location of the firearm in relation to the officer. The doctor answered "[i]f, as you say, the concrete's beveled out, the bullet had to have been fired from above in a downward fashion." N.T. at 569. It followed, the doctor opined under this same assumed scenario, that the two gunshot wounds to Officer Mahyle's back must have preceded this head wound given the "immediately incapacitating" effect severance of the spinal cord would have had. N.T. at 576-78.

Moreover, the shallower of the two back wounds was marked by a path entering the low back and exiting much higher, consistent with the officer bending down in a running motion.  N.T. at 580.  In fact, the doctor opined, the three shallow wounds to the officer's body were all consistent with this physical position.  N.T. at 576-78.

On cross-examination, however, defense counsel gained the doctor's agreement that the fatal gunshot to the face could not have created the bevel on the concrete beneath the officer because that slug never exited the head:

**DEFENSE COUNSEL:**     That wound A [the fatal head wound], there is no exit, correct?

**DR. LUCKASEVIC:**     That is correct.

**DEFENSE COUNSEL:**     So that wound didn't bevel any sidewalk. Would that be correct to say?

**THE COURT:**     What?

**DEFENSE COUNSEL:**     That bullet doesn't bevel any sidewalk.

**DR. LUCKASEVIC:**     No.  It stayed in -- that bullet --

**DEFENSE COUNSEL:**     Gunshot wound A didn't bevel any sidewalk?

**DR. LUCKASEVIC:**     No, it stayed there, that's correct.

**…**

**DEFENSE COUNSEL:**     [The prosecutor] asked you to opine that because there are bevels in the sidewalk, that the gunshot wound A came from up above.

**DR. LUCKASEVIC:**     I don't think I opined that.  I thought I said the muzzle was in front of his face.

**DEFENSE COUNSEL:**     So you're not saying that at all?

**DR. LUCKASEVIC:**     Correct.

**DEFENSE COUNSEL:** You can't say where the person was unless you know exactly the position of the body at the time that they were shot?

**DR. LUCKASEVIC:** Right. You can give me scenarios. I can say that's consistent with, but I don't know 100 percent where the body was, where the shooter was, where the gun was. I don't know any of that. Again, I'm just dealing with the terminal trajectory or terminal path of the bullet. I have no idea where the gun -- where it flew in the air, if it actually deflected off something, I don't know that.

N.T. at 585, 586-87.[12] Defense counsel went on to develop Dr. Luckasevic's opinion further on the point by asking him if he could tell where Officer Mayhle was at the time he received the fatal wound. "There is no way to tell that. No[,]" Dr. Luckasevic testified. N.T. at 592. Finally, after the prosecution, on redirect, elicited the opinion that Officer Mayhle may have been shot in the face after he fell backwards off the front porch steps and sustained a traumatic concussion-type injury on impact, defense counsel, on re-cross, confirmed, again, that it was not possible for the doctor to know with any degree of certainty the order of events:

**DEFENSE COUNSEL:** So you can't tell us then in what order A [the fatal gunshot wound to the face] or B [the impact injury to the back of the head] came; is that right?

**DR. LUCKASEVIC:** That's correct. We have -- I can't tell, no.

**DEFENSE COUNSEL:** So he could have gotten shot in the face and then fell down the steps?

**DR. LUCKASEVIC:** That's correct, or he could have fell [sic] down the steps and got shot in the face.

**DEFENSE COUNSEL:** Neither one [being] more or less likely?

---

[12] On redirect, Dr. Luckasevic did opine that one of the marks in the concrete slab located directly behind Officer Mayhle's head could have possibly resulted from a bullet, fired from the front porch, that skipped off the sidewalk and lodged in the officer's head as he lay there. N.T. at 597.

**DR. LUCKASEVIC:** I can't tell, no.

N.T. at 601.

According to Appellant, this testimony corroborated the Commonwealth's case in chief that Appellant was firing down upon the officers and thereby "clearly helped the Commonwealth establish first-degree murder and the specific intent to kill." Brief of Appellant at 58. The trial court's observation that this portion of the expert opinion was "not rocket science" ignores the accepted purpose of expert evidence, Appellant continues, which is to explain matters beyond the knowledge or experience of the average lay person. Brief of Appellant at 57 (citing Commonwealth v. Minerd, 753 A.2d 225, 230 (Pa. 2000)).

Appellant's argument, however, fails to explain through any developed argument or citation to authority how the exclusion of Dr. Luckasevic's testimony on victim positions at the time of the fatal shooting would have created a reasonable possibility of a different outcome on the first-degree murder charge. Moreover, the record demonstrates that defense counsel ably nullified the victim position line of questioning through her cross-examination of Dr. Luckasevic, which developed the critical expert opinion that it was not possible to ascertain from the wound angle Officer Mayhle's precise location and position at the time he received his fatal wound. The most Dr. Luckasevic offered was an opinion that Officer Mayhle's gunshot wounds were just as likely caused in a manner consistent with the Commonwealth's hypothetical as they were with the defendant's alternate hypothetical. N.T. at 601. As such, Appellant's claim that Dr. Luckasevic's testimony unfairly prejudiced him is without merit.

Appellant also complains that reversible prejudice arose when the court permitted Dr. Abdulrezak Shakir, a forensic pathologist for the Allegheny Medical Examiner's Office, to testify about what type of projectile caused the wounds to Officer Sciullo. As Dr. Shakir began to describe how the wound was not a "typical gunshot wound of an ordinary bullet," N.T. at 890, defense counsel anticipated that the doctor would identify the bullet that caused the wound and objected. At sidebar conference, the court rejected defense counsel's argument that the testimony went beyond the scope of the coroner's report and ambushed the defense with surprise testimony. "He's going to base it on the size of the wounds. I assume that this is one of the shotgun slugs," the court predicted correctly. N.T. at 890.

Dr. Shakir opined that the gaping entry wound in Officer Sciullo's head was not the kind of entrance wound one finds with an "ordinary bullet" fired from "ordinary guns, like handguns and rifles," but was caused, instead, by a rifled shotgun slug that caused profound brain injury and, ultimately, death. N.T. at 892. Dr. Shakir went on to describe a second gunshot wound that transected the brain as well and constituted another lethal wound, N.T. at 897, and thereafter catalogued six more entry wounds to the head, neck, and torso of Officer Sciullo, two of them received post-mortem, he opined, as the officer's body lay in the doorway to Appellant's home. N.T. at 892-910.[13]

---

[13] On cross-examination, defense counsel elicited the expert's agreement that the two post-mortem wounds to Officer Sciullo's torso were most likely incurred from police gunfire hours later when the S.W.A.T. force was providing cover for officers attempting to reach the fallen officers. N.T. at 930-31. Counsel also succeeded in rebutting any inference made during direct that the two fatal head wounds possibly occurred while Officer Sciullo was on the ground, as Dr. Shakir agreed with counsel's understanding of

(…continued)

With respect to the testimony of Dr. Shakir, we agree with the trial court that the coroner's report identifying comparatively large entry wounds to Officer Sciullo placed Appellant on fair notice that Dr. Shakir may draw the reasonable inference that a shotgun rifled slug was used. See Trial Court Opinion, dated 11/5/12 at 28. Even if we were to assume, instead, that a discovery violation attended this expert testimony, Appellant fails to specify how the testimony caused him prejudice other than offering a generic statement that the expert opinion was "particularly damaging" because it included "what weapons were used." Brief for Appellant at 54. Appellant's own properly admitted statement to police, however, indicated he had shot Officer Sciullo with a shotgun rifle slug. Again, our precedent cited above clarifies that prejudice is not simply presumed in the instance of a discovery violation, but must be established by the complaining party. We therefore find that no reversible error attended the admission of Dr. Shakir's expert testimony on slug types. To the extent Appellant's challenge to Dr. Shakir's testimony may be fairly read to incorporate generic assertions, appearing elsewhere in the brief, that the testimony included improper opinion on the position of Officer Sciullo at the time he was shot, the record demonstrates that defense counsel effectively cross-examined the expert on this point. See footnote 13, *supra*.

Finally, well into the testimony of expert Dr. Robert Levine, a firearms examiner for the Allegheny County Medical Examiner's Office, the defense objected that he had testified to a number of opinions that were not contained in his report:

---

(continued…)

the ballistics evidence that the wounds could not have been sustained at the location where the officer's body was recovered. N.T. at 924-25.

**DEFENSE COUNSEL:** I have sat through seven, eight opinions from Dr. Levine that are not contained within his lab report. Eight of them. I am now starting No. 9. I don't know what I am supposed to do with this information. I gave an opening statement saying that the physical evidence didn't match my clients' statement, and the prosecution is now bringing in ten different opinions that I've never heard before. It's prosecutorial misconduct, and I move for a mistrial.

I can't imagine they had the gall to object to a suppression motion being late, and they are bringing opinions in in the middle of trial. I don't know how to defend against this. I'm sorry. It's never happened before.

**THE COURT:** Motion for mistrial is denied. [About] Dr. Levine, you had an opportunity to interview him. He's not doing anything that I see that's beyond the scope of his report. He's a ballistics expert. He tells you where bullets go and where they came from, and that's exactly what he's doing.

**DEFENSE COUNSEL:** And identifies what kind of bullet they are, and I had no idea prior to him beginning to testify that --

**THE COURT:** We'll take a break, give you a 20 minute break before you have to cross-examine.

**DEFENSE COUNSEL:** If I may, I asked Dr. Levine yesterday if there were going to be any surprises for me today, if he was going to be --

**THE COURT:** How does he know when you're going to be surprised?

**DEFENSE COUNSEL:** I said, are you going to be offering any opinions that are not in your report?

N.T. at 1110-11. When the prosecutor interjected that he was simply asking Dr. Levine to identify on a prepared diagram from which side of a hole in the wall a shot was fired based on the locations of the holes and where investigators recovered the bullet, defense counsel responded that was one of her concerns because she did not know that "that hole was associated with that bullet because there are four holes in that wall." N.T. at 1111. Appellant objected that not only did Dr. Levine's report fail to match bullets with holes and address trajectories, but the doctor also had indicated to defense

counsel just days before that he would not be offering any opinion not contained in his report.  N.T. at 1111-12.

Appellant again asserts prejudice stemmed from his inability to prepare an appropriate defense to surprise opinion testimony pertaining to these important details about victim and shooter positioning.  Another example of surprise testimony offered by Dr. Levine, Appellant says, was his opinion that marks observed on the concrete sidewalk leading to Appellant's front porch could have been made by downward angled shots fired from an AK-47 type gun.  Defense counsel had objected to the prospect of such evidence on the day before Dr. Levine testified, but this objection was denied. This testimony was particularly damning, Appellant submits, because it suggests that Appellant stood over the officers and fired down at them, thus "clearly help[ing] the Commonwealth establish first-degree murder and the specific intent to kill."  Brief for Appellant at 58.

The Commonwealth responds, initially, that no discovery violation took place, as the defense had ample notice that the concrete slab had been removed from the sidewalk and could be used to establish that Appellant fired gunshots at Officer Mayhle as he lay there.  This opinion was expressed by the trial court in denying defense counsel's objections the day before:

> **THE COURT:**      Ms. Middleman [Defense Counsel], you've known for a long time that they had that concrete slab.  You had pictures of the concrete slab.  You had pictures of the marks on the concrete slab.

N.T. at 880.  Appellant still had the opportunity to ask his own expert to give an opinion on the evidence, the Commonwealth continued, and it cited the trial court's observation prior to testimony that the matter involved "one question.  He's [the defense expert]

either going to agree or not agree. They are experts. They are either going to say or not say it is." N.T. at 880.

The Commonwealth further justifies its hypothetical question eliciting opinion on the source of concrete markings as having been properly based on eyewitness testimony that Appellant stood on his front porch firing what looked to be an AK-47 type assault rifle down at the motionless body of Officer Mayhle. Dr. Levine's responsive opinion was a reasonable inference drawn from the evidence and was, under our decision in Commonwealth v Montalvo, 986 A.2d 84, 95 (Pa. 2009) (upholding admission of expert opinion based on competent evidence and reasonable inferences therefrom), properly admitted on that basis, the Commonwealth maintains. Brief for Appellee at 47.

The record shows that defense counsel's vigorous cross-examination of Dr. Levine ably revealed the limitations of his shooter/victim position opinions drawn from ballistics evidence obtained at the crime scene. The markings or "defects" on the concrete slab had the appearance of being caused by a gunshot, Dr. Levine testified, but he also conceded that he could not say with any degree of certainty that it would have been from the AK-47 type rifle Appellant was said to be firing. N.T. at 1146-47. Nor, for that matter, could he say from what direction the bullets hitting the slab were fired or how old the defects were. N.T. at 1146-47. With respect to ballistics evidence gathered inside the home, the record shows that Dr. Levine opined on direct examination how placing a straight probe through a hole and connecting to a bullet lodged in a closet wall enabled him to infer the location of Appellant during the time of the shooting. On cross-examination, however, Dr. Levine acknowledged defense

counsel's point that it is accurate to describe the use of a probe as assisting in determining bullet flight lines rather than the precise locations of a shooter, and consequently modified his diagram to allow for a range of possible locations anywhere along a line cutting across several rooms in the interior. N.T. at 1133-34.

Defense counsel's ability to handle so deftly this purportedly unfairly surprising expert opinion leads us to conclude that no prejudice accompanied the prosecutor's questionable practice of eliciting expert inferences and opinions from Dr. Levine that were not included in his report. Defense counsel significantly limited the value of Dr. Levine's opinions by establishing that bullets fired from any direction could have made the concrete markings in question and the respective points from which Appellant and Officer Mayhle exchanged gunfire could have been anywhere along lines spanning several rooms. Moreover, Appellant fails to explain how he could have further rebutted this evidence had discovery of such expert opinion been received sooner. We, therefore, find any error in the admission of Dr. Levine's testimony was harmless.

Finally, Appellant contends the aggregation of all the discovery violations he asserts required the court to grant his motion for mistrial. It was grossly unfair and alarming, he argues, that the Commonwealth was not only using expert testimony beyond what it presented during discovery but was also gathering more expert opinion during the course of trial, all without volunteering the post-discovery opinion when it gained it. N.T. at 879. The Commonwealth had two years in which to supplement reports and supply opinions regarding the officers' body positions when shot, what weapons were used, where Appellant stood when he shot at the officers, and ballistic evidence that the defense was unaware of and unprepared to defend against. The

result of this impermissible gamesmanship of withholding crucial expert conclusions and inferences up until the time the expert was on the witness stand, Appellant posits, warranted the remedy of mistrial.

It is well settled that no number of failed claims may collectively warrant relief if they do not do so individually. Commonwealth v. Johnson, 966 A.2d 523, 532 (Pa. 2009). "Yet, when the failure of individual claims is based upon a lack of prejudice, the cumulative prejudice arising from those individual claims may properly be considered." Commonwealth v. Simpson, 112 A.3d 1194, 1205-06 (Pa. 2015) (citations deleted).

Regarding each admission of expert opinion evidence not fairly included in pretrial discovery, our assessment above is that either properly admitted evidence from independent sources had already established the same point, or effective cross-examination of the expert had greatly diminished or altogether eliminated the incriminating force of the opinion. We, therefore, discern no indication that the aggregate effect of discovery violations prejudiced Appellant, particularly in light of compelling evidence supporting the charges of first-degree murder.

### V. Admission of StormFront.Org Website Visit

Appellant next asserts reversible guilt and penalty phase error attended reference to his internet visit to a "white nationalist" website in the hours before he committed his deadly acts. He first charges error with the ruling permitting the Commonwealth to introduce guilt phase evidence that he visited the website StormFront.org, identified as a "white nationalist," "anti-Semitic" website, several hours before the shootings began. This evidence was irrelevant to proving intent, Appellant argues, as there was no indication that his crimes were motivated by race or anti-

Semitism, and was highly prejudicial as it was used to cast Appellant as a morally reprehensible person who associated himself with the beliefs and attitudes of white supremacists and neo Nazis. Using this evidence to draw an adverse inference, moreover, violated Appellant's First Amendment right to freedom of association, he argues.

Initially, Appellant claims the trial court, in admitting the evidence, erroneously reversed its pre-trial ruling that granted Appellant's motion *in limine* to preclude testimony describing 41 pages of Appellant's postings on the StormFront.org website. At the pre-trial hearing, the court determined that Appellant's racist comments posted on the website were irrelevant to his state of mind during the alleged attack on police because nowhere in his postings had he endorsed or threatened violence against police.

> **THE COURT:** Perhaps I am missing something. Even if the Commonwealth were able to establish by some standard that Mr. Poplawski harbored -- and I'm not saying he did harbor -- racist or anti-Semitic views, what does that have to do with this case?
>
> **PROSECUTOR:** Well, Your Honor, he expressed --
>
> **THE COURT:** He is alleged to have shot three police officers in uniform and on duty.
>
> **PROSECUTOR:** One of which is an African American.
>
> **THE COURT:** Oh, come on. First through the door, last though the door, you're seriously going to tell me that he shot Sciullo and Mayhle to get to Kelly? Is that what we're …
>
> **PROSECUTOR:** That's not what I am saying, Your Honor. I am saying he has expressed animus toward police officers, toward African Americans and to just about every other race and nationality on the face of the earth.
>
> ***

**DEFENSE COUNSEL:** Your Honor, I would suggest to this Court this is an attempt by the Commonwealth to paint our client as a domestic terrorist unrelated to this event, and that, of course, then taints the potential penalty stage as well. The only thing that's on point, could be on point is animus toward police.

Again, the only thing I've been given is six pages of indeed postings there. I would suggest to this Court reading those postings, there's nothing that expresses animus toward police whatsoever. If indeed he uses bad thoughts, bad words, if he indeed posted feelings of anti-Jew, anti-black, anti this anti that, it's, again, before you get to the point, it's unrelated to the actual offense itself, and as a result should be inadmissible as evidence.

**THE COURT:** [Prosecutor], can you point the Court to a posting that shows animus toward the police?

N.T. at 6-11.

As the prosecutor searched her notes, defense counsel directed the court's attention to an excerpt from page 10 of Appellant's postings wherein Appellant wrote "I mean, I'm not talking about disrespecting any cops. Just not bending for them in fear as many people do." N.T. at 11. Defense counsel continued that Appellant wrote of the potential of needing guns to safeguard personal interests, but observes that there is "not an actual threat toward any racial group, ethnic group or police contained anywhere in the 41 pages that the [trial court] has in front of him." N.T. at 14. The prosecutor offered nothing to contradict defense counsel's account of the postings. N.T. at 14.

Invoking <u>Dawson v. Delaware</u>, 503 U.S. 159, 112 S.Ct. 1093, 117 L.Ed.2d 309, (1992),[14] the trial court ruled there was no constitutional ground upon which to admit Appellant's postings, as they were unrelated to the crime committed:

**THE COURT:** The Court will grant the motion in *limine*. The evidence of Mr. Poplawski's beliefs as opined by Mr. Pitcavage [the detective who retrieved Appellant's website postings] will not be permitted in evidence, neither will any posting in the guilt phase of the proceeding.

The Court, however, will reserve the right to permit those into evidence in the penalty phase, inasmuch as Court [sic] does not know what the defense -- pretty much knows what the Commonwealth is going to present as aggravating circumstances, but I have no idea what the defense is going to present as mitigating circumstances, and the Commonwealth may use some of that information as rebuttal to matters which the defendant may well present.

N.T. at 14.

Contrary to Appellant's contention, therefore, the guilt phase transcript shows not a reversal of the court's pre-trial ruling as it related to Appellants postings, but, instead, a ruling on whether an investigator could testify that Appellant had visited the StormFront.org website in the hours before the shooting. To this offer, the only objection defense counsel advanced was that the visit was irrelevant to Appellant's

---

[14] In <u>Dawson</u>, the United States Supreme Court held that a First Amendment violation attended penalty phase evidence and argument that the defendant belonged to the Aryan Brotherhood, a white racist group, where there was no indication from the stipulation that the group endorsed or threatened the kind of violence for which the defendant had been charged. The Court acknowledged there is no *per se* barrier to the admission of evidence of protected beliefs that bear a relation to proving the crime charged. Dawson's membership in a racist group, however, bore no relationship to his violent crime against a white victim. Nor was it relevant to mitigation evidence that he was a caring family member and had earned good conduct credits in prison by attending substance abuse classes. Evidence of his membership, therefore, was unconstitutionally prejudicial, the Court held, and it vacated judgment of sentence and remanded the matter for further proceedings, leaving open the possibility for a harmless error determination.

state of mind at the time of the shooting. When the court agreed with this position but nevertheless declared the evidence admissible for its contextual value, i.e., to show the sequential history of events leading up to the shootings, defense counsel offered no further objection to admission on that basis:

> **DEFENSE COUNSEL:** One of the exhibits is a list of all of the websites that were visited from their Compaq computer for the 24 hours preceding the shooting. My understanding is that Detective Haney will be giving, in addition to authentication the list of websites, he will give a brief description of each website. But I think this is akin to the issue of the books in that just because you read something or look at something, that's not evidence of your state of mind. So I would suggest to the Court that this is very similar to the books and irrelevant.
>
> In addition, I think it would be very difficult, given that the computer was in a house that was shared by more than one person to differentiate between that which is --
>
> **THE COURT:** Do you want to respond to that?
>
> **PROSECUTION:** Yes. Number one, that's why we had the stipulation to Mr. Poplawski's fingerprint on the computer. With regards to his web browsing, Your Honor, I would only propose to put in a single page, which would be from 3:30 a.m. on the morning of the 4th, up until 5:00 a.m. on the morning of the 4th.
>
> Your Honor, my understanding was Your Honor disallowed the books because we couldn't necessarily show that there was any link between his state of mind, and he could have read those when he was -- like you did when you were in college and so forth. This I think is a little bit different because --
>
> **THE COURT:** All right. It's contemporaneous with the event, but what is it that it shows?
>
> **PROSECUTION:** Basically, there are a variety of things that are visited here. Most relevant, Your Honor, there's a website called Raw Meaty Bones. He was looking at dog biscuits.
>
> **THE COURT:** That's certainly not relevant.
>
> **PROSECUTION:** No, Your Honor, it's just the whole -- the list is in the order that it's in. They are all there. Another one is Let's Go Pens. It's a

hockey website. The other one is StormFront, which Your Honor's well aware of that he was -- and we do not intend to produce any specific postings from StormFront, merely that he was on the website. There's also a Fox News link to a contemporaneous story about the mass murder turned suicide in upstate New York where a number of people were murdered and then the shooter took his own life. These, again, that's all -- that's on this one page from --

. . .

**PROSECUTION:** It's 3:28.08 a.m. up until -- the last posting is 4:58:59 a.m.

**DEFENSE COUNSEL:** Your Honor, I would suggest to the Court that because he was on the Meaty Bones website, that doesn't make him a dog. And because he is on the Penguin website [after brief trial court interruption] because he's on the Penguin website, that doesn't make him a hockey player. Because he was on StormFront --

**THE COURT:** I'm going to allow this to be introduced because it shows what he was doing immediately prior. If he were drinking beer, taking drugs or if he were doing those things, Commonwealth would be entitled to show that, too. It will come in without any further comment about it. The jurors can make whatever appropriate inferences they feel.

**DEFENSE COUNSEL:** So then Detective Haney will not be permitted to describe --

**THE COURT:** He'll be able to describe what the websites are, yes, but briefly and quickly, I hope.

N.T. at 870-72.

The pre-trial and trial transcripts therefore show the trial court precluded only testimony regarding beliefs Appellant had expressed in postings on the website, on grounds they were unrelated to his attack on the police and, thus, irrelevant. Otherwise, the trial court deemed Appellant's website visit admissible as part of the narrative concerning his actions in the hours leading up to the shootings. To admission of the website visit on this basis, Appellant offered no objection and sought only clarification as

to the extent Detective Haney would be permitted to elaborate on the website itself.[15]

Appellant has, therefore, waived his present challenge to the admission of such evidence. Pa.R.A.P. 302 (preservation of issue must be made with a timely and specific objection; appellant may not raise an issue for the first time on appeal). Freeman, supra at 402 (abrogating this Court's capital direct appeal relaxed waiver rule and holding, "as a general rule on capital direct appeals, claims that [a]re not properly raised and preserved in the trial court are waived and unreviewable. Such claims may be pursued under the PCRA, as claims sounding in trial counsel's ineffectiveness or, if applicable, a statutory exception to the PCRA's waiver provision.").

Appellant also asserts prosecutorial misconduct during the penalty phase summation, where it was suggested that Appellant drew his motivation from the StormFront.org website:

> **PROSECUTOR:** Richard Poplawski was smart enough to know better. Richard Poplawski was smart enough to make something of himself. What might he have done with his life with that 135 IQ? We'll never know because he used his powers, left the light and went into the darkness. What kind of darkness?
>
> Look at what he was doing in the hours before he murdered these three good men. What kind of things was he looking at? He was reading about a mass murderer in Upper State New York who killed a bunch of immigrants who had come to this country to become citizens, and then he took his own life. He was visiting the Nazi website StormFront. Nazism, StormFront, haters, ladies and gentlemen. Richard Poplawski turned a[ll] those intellectual powers towards evil. And what he learned on those websites, chatting with those people, those like-minded haters and bigots and racists, we'll never know. But I submit to you, folks, that's where all this came from.

---

[15] Though the trial court interjected before defense counsel finished her question seeking clarification, we may infer from her silence afterward that the court had answered her intended question.

N.T. at 328. With this argument the prosecutor attempted to "stoke the passions and prejudice of the jury," Appellant argues. Yet, defense counsel offered no objection to the prosecution's closing, electing, instead, to present a contrary summation that the evidence showed Appellant was perhaps a man frustrated with the government and what he considered its unpatriotic policies on, among other things, gun ownership:

> **DEFENSE COUNSEL:** Now, again, I remembered Deputy Garrett interviewed my client in the jail, and you heard some of that. My client was saying, I'm a patriot. The world and the United States as we know it is going to fall apart. There's going to be some type of war going on. The government I don't trust. Well, again, there wasn't a whole lot of emphasis on that in this entire case until right now. Counsel closed to you and he brought that issue up.
>
> Well, it's not the elephant in the room that no one talks about. The proverbial horse is out of the barn because one thing we haven't really talked about here is what's going on, not just right now, not just in Pittsburgh, what hasn't been talked about and why people act the way that they do, you have people out there, you have a lot of people out there, they claim to be patriots. That's the word my guy used. There's a couple themes they have. The one theme is we hate the government. We don't trust the government. And they have their websites, they have this, they have that. But usually what they believe in is, number one, we hate the government, we don't trust it, and frankly, they are not going to take our guns.

N.T. at 358-59.

Now on appeal, for the first time, Appellant protests against the prosecutorial suggestion that he acted on a hatred and racism cultivated during visits to the website. To the trial court's opinion that he has waived this issue on appeal for failing to make a timely and specific objection, he contends that such position is "disingenuous" where he had already achieved a pre-trial ruling barring evidence describing the beliefs Appellant expressed in his website postings, only to see the ruling undone later during the guilt phase:

An appellant cannot be faulted for waiving an issue where the issue was the subject of a pretrial motion and hearing. To hold that this issue is not preserved is baffling and unfounded based on the record. A pretrial motion was litigated, and despite initially being granted, later denied by the trial court's decision to allow the testimony detailing the nature of the website. Counsel would have no reason to double object on the same basis argued during the pre-trial motions as the judge's decision to allow the testimony in the middle of trial constituted a ruling on the issue.

Brief of Appellant, at 67.

Appellant's account is inaccurate, however, for, as our review above identifies, the trial court did not reverse itself on the pre-trial ruling that Appellant's racist and anti-Semitic beliefs as expressed in connection with the StormFront.org website were inadmissible. The most the court permitted during the guilt phase trial with respect to Appellant's visit to StormFront.org was to show his actions in the hours before the shooting. This guilt phase ruling did not upset the pre-trial ban against evidence relating to beliefs, and, thus, gave no reasonable indication that it would be futile to object to a penalty summation suggesting Appellant drew motivation from hateful content expressed on StormFront.org. It was incumbent upon Appellant, therefore, to make a contemporaneous and specific objection to this effect. This issue has been waived. See Commonwealth v. Jordan, 65 A.3d 318, 336 (Pa. 2013).[16]

---

[16] We reject Appellant's position that merits-review is required pursuant to our observation in Baumhammers, supra at 72, that some issues are of a "primary constitutional magnitude" so as to necessitate immediate review even where the appellant has defaulted on the claim by failing to preserve it appropriately. The entirety of Appellant's argument in this regard is that "this is a matter of constitutional significance as the United States Supreme Court recognized [in Dawson v. Delaware, supra] that this issue impacts on an individual's First Amendment rights. Commenting upon Mr. Poplawski's protected rights as a means to gain a death sentence is improper and flies in the face of established precedent." Brief of Appellant at 68-69.

(…continued)

## VI. Future Dangerousness

In his next issue, Appellant asserts that the prosecutor, in both opening and

closing penalty phase remarks, impermissibly argued that Appellant posed a future

---

(continued…)

Unlike in Dawson, however, which turned on the admission of evidence during the penalty phase that the defendant was associated with the Aryan Brotherhood, there was no evidence admitted here that Appellant associated with a white nationalist organization. Rather, the only evidence admitted was a stipulation that in the hours before the shootings, Appellant had visited a number of websites including StormFront.org. By contrast, the defendant in Dawson specifically argued that it was the admission of evidence related to his association that violated his constitutional rights. The Supreme Court held that such evidence of abstract beliefs was irrelevant:

> Whatever label is given to the evidence presented, however, we conclude that Dawson's First Amendment rights were violated by the admission of the Aryan Brotherhood evidence in this case, because the evidence proved nothing more than Dawson's abstract beliefs. Cf. Texas v. Johnson, 491 U.S. 397, 414, 109 S.Ct. 2533, 2544, 105 L.Ed.2d 342 (1989) ("[T]he government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable"). Delaware might have avoided this problem if it had presented evidence showing more than mere abstract beliefs on Dawson's part, but on the present record one is left with the feeling that the Aryan Brotherhood evidence was employed simply because the jury would find these beliefs morally reprehensible. Because Delaware failed to do more, we cannot find the evidence was properly admitted as relevant character evidence.

Id. at 167, 112 S. Ct. at 1098.

The present case is factually distinguishable from Dawson. While the prosecutor offered his personal viewpoint to the jury in his summation that the website visit revealed Appellant's endorsement of the views expressed therein, this argument did not constitute evidence, and the jury was so instructed as to that fact. As it stood by the end of penalty phase summations, the Commonwealth had presented no evidence that Appellant held any membership, allegiance, or commitment with, or had expressed any endorsement of or belief in, the white nationalist movement as discussed in the website he visited for several minutes that morning. Because Appellant's connection with this belief system was too attenuated under the evidence, we disagree with Appellant that this issue raises a First Amendment matter of primary significance as to require that we forego invocation of the waiver doctrine.

danger to the prison population. The standard under which claims of prosecutorial misconduct are to be reviewed is well-established:

> It is well settled that, during the penalty phase, where the presumption of innocence no longer applies, a prosecutor is afforded reasonable latitude and may properly comment on the evidence with oratorical flair. Comments by a prosecutor do not constitute reversible error unless their unavoidable effect was to prejudice the jury, forming in their minds a fixed bias and hostility toward the defendant such that they could not weigh the evidence objectively and render a true penalty determination.
>
> * * *
>
> [R]emarks made by a prosecutor must be evaluated in the context in which they occur. Furthermore [in closing argument], the prosecutor may fairly respond to points made in the defense closing.
>
> * * *
>
> [W]ithin reasonable bounds enforced by the trial court, a prosecutor may employ oratorical license and impassioned argument in arguing for the death penalty. While reference to irrelevant matters should be avoided, we note that murder victims are not simply props or irrelevancies in a murder prosecution, and innocuous references to victims and their families are not necessarily prejudicial.
>
> Commonwealth v. Freeman, 827 A.2d [at] 408–09, 413, 415 [ ](internal citations and quotation marks omitted); see also Commonwealth v. Fletcher, 861 A.2d 898, 917 (Pa. 2004) ("There is nothing improper in the prosecutor arguing the appropriateness of the death penalty because that is the only issue before the jury at the penalty phase of the trial.") (citation omitted). However, this Court has deemed improper "overly aggressive or highly inappropriate advocacy that could have impermissibly shifted the balance in favor of a death sentence." Freeman, supra at 415 (citation and internal quotation marks omitted).

Paddy, supra at 458-59. "In making such a judgment, we must not lose sight of the fact that the trial is an adversary proceeding . . . and the prosecution, like the defense, must be accorded reasonable latitude in fairly presenting its version of the case to the jury."

Commonwealth v. Rainey, 656 A.2d 1326, 1334 (Pa. 1995) (citations omitted).

The first contested remark occurred during opening arguments in which the prosecution discussed the multiple murder aggravating factor at Section 9711(d)(11) that it sought:

> **PROSECUTOR:** So what is the first aggravating factor? The first aggravating factor is that at the time of the killing, Richard Poplawski took two additional lives. So that in other words, for Paul Sciullo's count of murder, you can consider the murders of Stephen Mayhle and Eric Kelly. For Stephen Mayhle's murder, you also can consider the murders of Paul Sciullo and Eric Kelly, and for Eric Kelly you should also consider the murders of Paul Sciullo and Stephen Mayhle. That's the first aggravating factor. I submit to you, you don't need to hear any more evidence on that. It's been proven beyond any doubt that Richard Poplawski murdered those three men.
>
> Now, what does that tell you? Why is this an aggravating factor? Why is that a factor that makes this case worthy of the death penalty? Well, it's because Richard Poplawski got a taste of what it was like to murder somebody. And he did it two more times. I submit to you he could have stopped after the first or second, but he didn't.
>
> Think about the things that he said when he was inside that house. I just want to shoot one more time. Think about his attitude on the phone with the 911 dispatchers. Oh, no, he's already dead. I shot him with a 12-gauge and something else. I'm the one that needs help. Ladies and gentlemen, I submit to you, Richard Poplawski got a taste and he liked it. He's like a dog that's bitten once and will bite again, and he did that day. Two more times. That's the first aggravating factor. I'm not going to present any more evidence on that.

N.T. at 17-18.[17]

At the conclusion of the prosecutor's opening, defense counsel sought a mistrial and asked the court to bar future death penalty proceedings for what she argued was the prosecutor's willful disregard of the court's earlier ruling against future

---

[17] We condemn the prosecutor's comparison of Appellant to a dog as highly irregular and improper. Given the overwhelming aggravating circumstances, however, we refrain from concluding that the comment so infected the jury that it could not weigh the evidence objectively and render a fair sentence.

dangerousness argumentation. N.T. at 32-33. The court agreed that the prosecution had flouted its earlier ruling, but it denied the request for mistrial. Side bar discussion concluded with the court indicating it would reconsider its position on the admission of such evidence later in the penalty proceedings. N.T. at 34. The court, however, made no subsequent reversal of its side bar ruling.

Appellant contends that the court's admonishment without consequences was insufficient in light of the prosecutor's clear attempt to prejudice the jury with a prohibited future dangerousness argument. Both the Commonwealth and the court respond that Appellant has mischaracterized the opening remarks, as they addressed not the future danger Appellant posed but, instead, his commission of multiple crimes in satisfaction of the Section 9711(d)(11) aggravator.

We agree that the prosecutor confined his opening remarks to Appellant's past conduct without introducing commentary about future dangerousness. If read in a vacuum, the first part of the statement--"[h]e's like a dog that's bitten once and will bite again"--is predictive and would seem to signal a discussion of future conduct. There is more to the statement, however, and, when read both in its entirety and in context, it is a description of the past: "He's like a dog that's bitten once and will bite again, *and he did that day. Two more times.*" The prosecution, moreover, made this statement within an argument dedicated to establishing only that Appellant's actions on the day of his crime qualified as an aggravating circumstance under Section 9711(d)(11). We therefore discern no future dangerousness argument in the prosecutor's opening remarks.

Appellant also charges misconduct with the prosecutor's closing argument, over objection, that racist and anti-authority statements attributed to Appellant during trial indicate he would pose a danger to prison guards and black inmates if he were to receive a sentence of life in prison. Appellant argues that the prosecutor's argument called upon the jury to consider his future dangerousness as a super-statutory, stand-alone aggravating circumstance, a use proscribed under our decisional law. See e.g. Commonwealth v. Trivigno, 750 A.2d 243, 253-56 (Pa. 2000) (plurality) (expressing concern that, under circumstances of the case, prosecutor offered future dangerousness argument as an aggravating factor). He acknowledges that this Court has never considered future dangerousness arguments to constitute *per se* error, but advocates that we change our position in accordance with the concurring opinion in Trivigno, which stated that an Eighth Amendment violation results from permitting a jury to consider non-statutory aggravating circumstances under a statutory scheme that requires the jury to select punishment based on a weighing of statutory aggravators and mitigators. 750 A.2d at 256-57 (Saylor, J. concurring).

The Commonwealth responds generally that under the case cited by Appellant, Trivigno, a prosecutor may argue future dangerousness as long as the court thereafter informs the jury "that a life sentence means that a defendant is not eligible for parole, but that the Governor has the power to grant a commutation of a sentence of life or death if based on the recommendation of the Board of Pardons following a public hearing." N.T. at 256. It is undisputed that the trial court so instructed the jury. See N.T. at 378-79.

> The admissibility of evidence is solely within the discretion of the trial court and we will reverse on appeal only upon abuse of that

discretion. Commonwealth v. Thomas, 717 A.2d 468, 477 (Pa. 1998), *cert. denied,* 528 U.S. 827, 120 S.Ct. 78, 145 L.Ed.2d 66 (1999). During the penalty phase, the Commonwealth may offer evidence to rebut a defendant's mitigating evidence of good character. Commonwealth v. Harris, 703 A.2d 441, 451 (Pa. 1997), *cert. denied,* 525 U.S. 1015, 119 S.Ct. 538, 142 L.Ed.2d 447 (1998) (upholding Commonwealth's introduction of several statements made by an appellant to rebut appellant's character evidence that he was a nice person and amenable to rehabilitation); Commonwealth v. Abu–Jamal, 555 A.2d 846, 858 (Pa. 1989), *cert. denied,* 498 U.S. 881, 111 S.Ct. 215, 112 L.Ed.2d 175 (1990) (holding that Commonwealth's introduction of statements made by appellant and his Black Panther membership to rebut appellant's character evidence that he was a peaceful and genial man).

Commonwealth v. Rice, 795 A.2d 340, 355 (Pa. 2002) (Opinion Announcing the Judgment of the Court).

"Future dangerousness is not an enumerated aggravating circumstance in Pennsylvania, See 42 Pa.C.S. § 9711(d), and, unlike the statutory aggravating circumstances, it may not be used by a jury as the sole reason for imposing a death sentence." Commonwealth v. Eichinger, 108 A.3d 821, 835 (Pa. 2014) (citing Commonwealth v. Marrero, 687 A.2d 1102, 1108 n. 19. (Pa. 1996)). It is not, however, *per se* error for a prosecutor to argue a defendant's future dangerousness, so long as the court grants the capital defendant's request to instruct the jury that his first-degree murder conviction precludes his eligibility for parole. See Id. (citing Simmons v. South Carolina, 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed 133 (1994); Commonwealth v. Chambers, 685 A.2d 96, 106 (Pa. 1996)).[18] Recently, in Eichinger, this Court upheld a

---

[18] Giving the Simmons instruction after the future dangerousness argument is made prevents a jury from mistakenly believing a defendant, convicted of first-degree murder, is parole eligible and may pose a danger to the public at-large. The instruction thereby protects the defendant's right to due process by ensuring the jury will review the defendant's purported dangerousness in its proper context. Appellant argues

(…continued)

prosecutor's discussion of the defendant's future dangerousness as fair response or rebuttal to the defendant's mitigation evidence placing his future conduct at issue.  Id.at 835.

The appropriate scope of rebuttal has always been defined according to the evidence that it is offered to rebut.  See generally Commonwealth v. Hickman, 309 A.2d 564, 567 (Pa. 1973) ("It is not proper to submit on rebuttal, evidence which does not in fact rebut the opponent's evidence.").  Indeed, in the character evidence setting, this precept has been particularly enforced.  See, e.g., Commonwealth v. Vander Weele, 514 A.2d 189, 193 (Pa. Super. 1986) (explaining, "[f]or instance, when a character witness testifies to being familiar with a defendant's reputation for truthfulness, cross-examination pertaining to a crime of assault is improper").

As part of his catch-all mitigating circumstance proffer, Appellant introduced character evidence that he had been an exceptionally bright, high-achieving, kind and helpful student who worked well with others and was a well-regarded classmate until his junior year in high school, when he suddenly left school.  N.T. at 270-287.  In closing argument, the prosecution alluded to such testimony specifically and asked whether Appellant would be a good or bad influence in prison.  The prosecution suggested the

---

(continued…)
summarily, however, that the Simmons instruction is "inadequate" where, as here, a prosecutor confines the dangerousness argument to the prison context.  While it may be correct that the prosecutor's argument as made obviated the need for the Simmons instruction, we decline to address further whether a due process deprivation arose from the instruction as given or from the absence of an alternate instruction, as the advocacy presented on the point does not support such a substantive discussion.

latter prospect, based on Appellant's admitted statements expressing opinions on law enforcement, race, and fighting in prison. The relevant summation follows:

> **PROSECUTOR:** And do you think Richard Poplawski is going to be a good influence or a bad influence in prison if you decide to give him life in prison without parole? Do you think he's going to be helpful like he was when he was in eighth grade, or do you think he's again going to use his powers for evil?
>
> Keep in mind, we know he's very bright. We know he can be very manipulative because you heard him talking to Sergeant Campbell for the better part of 45 minutes. We know that he dislikes black people. We know that he dislikes authority figures. We know how he feels about police officers. How is he going to react the first time a black inmate looks at him wrong in prison? How is he going to react the first time a jail guard in prison tells him to go to A or to B or go to C? What if that prison guard also is a man of color and he turns his back on Richard Poplawski?
>
> Ladies and gentlemen, make no mistake. This dog has bitten three times, and he will bite again if you give him the opportunity.

N.T. at 346-47.

As can be seen, the prosecutor attempted to frame this part of the summation as fair response to Appellant's mitigation offer that he had been a good influence on, and well-regarded by, his peers as recently as high school. However, consistent with assurances defense counsel previously made to the court that he would confine such good character evidence to a presentation concerning Appellant's past conduct, defense counsel never suggested this evidence was predictive of future good behavior toward prison staff and the general prison population. Therefore, the prosecutor's future dangerousness argument did not represent fair response to, or rebuttal of, Appellant's character evidence.

Nevertheless, in view of compelling aggravating circumstances, the court's proper instruction of the jury with respect to the particular aggravating circumstances up

for the jury's consideration, and the jury's finding of two mitigating factors, we discern no indication that prosecutorial remarks on Appellant's future dangerousness in prison so inflamed the jury as to have rendered it incapable of appropriately weighing aggravating and mitigating evidence. Accordingly, we reject Appellant's argument that such remarks shifted the balance of the jury's considerations in favor of the death penalty.

### VII. Penalty Phase Photographs and Images of Memorial Services

Appellant urges this Court to vacate sentence and remand for a new penalty hearing because of prosecutorial misconduct in presenting what he describes as inappropriate victim impact evidence relating to the fallen officers' funeral and memorial services. The prosecutor's presentation in this regard, Appellant contends, was marked by an intentional and overarching appeal to emotions and passions consisting of: family testimony recalling one officer's blood-stained religious medallion and the need for a closed casket viewing; a video of the city's memorial service depicting flag-draped caskets, moments of silence, and a funeral march to bagpipes; and other pictures of decorated monuments in the officers' honor. N.T. at 71-95. Even after the court *sua sponte* admonished the prosecution, Appellant argues, the prosecution was effectively permitted to continue in this course to his unfair detriment by showing another picture of a headstone. He asserts his penalty of death was therefore obtained in violation of his rights under the Fifth, Eighth, and Fourteenth Amendments.

Both the Commonwealth and the trial court respond that Appellant has waived this claim for raising it only now, for the first time, on appeal. Appellant concedes he did not object to any of the exhibits or testimony as they were being offered at trial, but nevertheless denies waiver rightfully applies where the record establishes that he filed

motions *in limine* seeking preclusion of "any non-statutory aggravating circumstance" and limitation of victim impact testimony to one representative from each family. We have previously rejected the same argument in holding that a generic, pre-trial motion may not substitute for a specific, contemporaneous objection never made to a trial court:

> Appellant never made timely and specific objections to the evidence. Appellant had filed a pre-penalty phase motion *in limine* to exclude all victim impact evidence on the grounds that, because such evidence did not pertain to any statutory aggravating circumstance, the admission of the evidence was unconstitutional. The court denied the motion, noting that the United States Supreme Court had ruled that such evidence was permissible, citing Payne [v. Tennessee, 501 U.S. 808 (1991)]. However, the court indicated that Appellant could request from the Commonwealth an offer of proof as to each witness and could lodge an objection particular to that witness if appropriate. Appellant never objected to any of the Commonwealth's fourteen victim impact witnesses. Because Appellant failed to object to the evidence on the grounds that he now raises, his issue is waived. Pa.R.A.P. 302(a).

Baumhammers, supra at 93 (footnote omitted). Accordingly, the instant claim is waived and may be considered, if at all, only as part of a collateral attack on trial counsel's stewardship.[19]

---

[19]Appellant offers as an alternative basis for issue preservation the trial court's *sua sponte*, side-bar order to cease with funeral related pictures and testimony:

> **THE COURT:** Mr. Tranquilli, I am sure out of due respect . . . [w]ith the victim's family here, [defense counsel] hasn't objected, but I'm telling you right now you're way over the line. First of all, that closed casket issue is way over the line. You will not ask those kind of questions again, and we're going to stop with the funeral issue. I'm done with it. You played the tape. That's it. Tailor this. I am not going to have this case come back because you step over the line, and that's all you have been doing.

(…continued)

## VIII.    Statutory Review

Turning, finally, to our statutory review of the death sentence under Section 9711(h)(3), we note that Appellant contends the Commonwealth sought during the penalty phase to inflame the passions of the jury in an effort to produce a sentence based on emotion rather than on a proper balancing of aggravating and mitigating circumstances.  Specifically, prosecutorial remarks in summation as to the future danger Appellant posed to prison guards and inmates, and its tack of showing images of memorial services held for the officers were improper appeals to emotion are properly captured under the Section 9711(h)(3) review, Appellant argues, and require remand for a new sentencing hearing.  As noted above, however, Appellant did not object to these statements and has thus waived the issues.  See Commonwealth v. Martin, 101 A.3d 706, 732-35 (Pa. 2014) (collecting cases in which this Court has declined to address defaulted penalty phase claims under the rubric of statutory review for arbitrary factors).

In any event, upon careful review of the record, we conclude that Appellant's three sentences of death were not the product of passion, prejudice or any other arbitrary factor, but were based, instead, on overwhelming evidence establishing that Appellant fatally shot Officers Paul Sciullo, Stephen Mayhle, and Eric Kelly with malice and the specific intent to kill.  The Commonwealth had the burden of proving the

---

(continued…)

N.T.(Penalty) at 95-96.  "The trial court's actions made an objection unnecessary," argues Appellant, Brief of Appellant at 81, but this cannot be so where he now argues that the proper remedy would have consisted of a mistrial and a new sentencing hearing, which clearly did not occur.  It was, therefore, incumbent upon Appellant to voice a specific and timely objection to this effect in order to preserve the issue he now raises; he failed to do so.  As the court's admonition, moreover, did not prevent him from lodging a prejudice objection, the application of waiver doctrine is appropriate.

existence of all applicable aggravating circumstances beyond a reasonable doubt. 42 Pa.C.S. § 9711(c)(1)(iii); Commonwealth v. Perez, 93 A.3d 829, 842 (Pa. 2014). The evidence sufficiently established that all three murder victims were police officers killed in the performance of their duties, in satisfaction of Section 9711(d)(1), and that Appellant was convicted of all three murders committed in the same criminal episode, satisfying the aggravating circumstance at Section 9711(d)(11). See Commonwealth v. Hairston, 985 A.2d 804, 809 (Pa. 2009) (aggravating circumstance applies if defendant murders two or more people in the same criminal episode). Finally, ample testimony established the Section 9711(d)(7) circumstance that Appellant created a grave risk of death to other persons besides the victim, including multiple other police officers on the scene, and in particular Officer McManaway, who took on heavy gunfire and sustained a shrapnel wound to the face and a direct gunshot wound to the hand as he attempted to save the life of Officer Eric Kelly.

Additionally, the sentence complies with the statutory mandate for the imposition of a sentence of death where one or more aggravating circumstances are found to outweigh any mitigating circumstances. 42 Pa.C.S. § 9711(c)(1)(iv). The record shows that the jury balanced three aggravating circumstances against two statutory mitigating circumstances and determined that the aggravating circumstances outweighed the mitigating circumstances. Therefore, there exists no ground to vacate the sentence

pursuant to 42 Pa.C.S. § 9711(h)(3)(i). Accordingly, we affirm Appellant's convictions and sentences of death.[20]

Mr. Justice Eakin, former Chief Justice Castille and former Justice McCaffery did not participate in the decision of this case.

Mr. Justice Baer and Madame Justice Todd join the opinion.

Mr. Chief Justice Saylor files a concurring opinion.

---

[20] The Prothonotary of the Supreme Court is directed to transmit the complete record of this case to the Governor of Pennsylvania. See 42 Pa.C.S. § 9711(i).