J-S25043-24

2024 PA Super 273

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| KEITH PHILLIPS | : | |
| | : | |
| Appellant | : | No. 2988 EDA 2023 |

Appeal from the Judgment of Sentence Entered May 12, 2023
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0002513-2020

BEFORE: DUBOW, J., McLAUGHLIN, J., and BECK, J.

OPINION BY BECK, J.: **FILED NOVEMBER 15, 2024**

Keith Phillips ("Phillips") appeals from the judgment of sentence entered by the Philadelphia County Court of Common Pleas ("trial court") after a jury convicted him of first-degree murder, attempted murder, aggravated assault, possessing an instrument of crime ("PIC"), carrying a firearm on public streets in Philadelphia, and carrying a firearm without a license.[1] Phillips challenges the trial court's denial of his motion to suppress statements he made during an interview with police on the basis that the interviewing detectives violated the protections of *Miranda v. Arizona*, 384 U.S. 436 (1966), after he had voluntarily waived those rights. Because we conclude that the detectives who conducted the interrogation violated the protections of *Miranda*, invalidating

---

[1] 18 Pa.C.S. §§ 2502(a), 901, 2702(a), 907(a), 6108, 6106(a)(1).

his waiver of those rights, we vacate Phillips' judgment of sentence and remand the case to the trial court for a new trial.

We summarize the factual history of this case as follows. I-Dean Fulton ("Fulton") was the subject of an FBI investigation involving drug trafficking. Fulton, suspecting that his cousin, Nasir Sadat ("Sadat"), was cooperating with the investigation, ordered "a hit" on Sadat.

On July 5, 2019, Jewell Williams, Jr. ("Williams") was driving around North Philadelphia at around 4:00 p.m., waiting to go to a haircut appointment. While passing the time, Williams saw his friend, Sadat, near the intersection of 16th and Clearfield Streets; he parked his car to greet Sadat. Sadat was in the process of rehabilitating a nearby property, and he asked Williams to look at the progress of the project. After viewing the property, Sadat and Williams walked across the street from the house to one of Sadat's work trucks where they conversed with each other and with a passerby. At this time, surveillance footage showed several individuals on bicycles circling the area. Shortly thereafter, one of the bicyclists, which surveillance footage of the incident showed to be wearing a shirt with a distinctive floral pattern, walked up to Sadat and Williams and opened fire. Sadat sustained gunshot wounds to his head, neck, and arm; Williams sustained gunshot wounds to his chest, buttocks, arm, leg, and back. The perpetrator immediately fled the scene.

Within one to two minutes, Philadelphia police officers arrived at the scene and immediately transported both Sadat and Williams to Temple University Hospital. Williams survived but had to undergo extensive surgery and spent two weeks in the hospital and several weeks at a rehabilitation facility. Sadat was pronounced dead at the hospital at 5:47 p.m. Philadelphia Associate Medical Examiner Dr. Khalil Wardak determined that Sadat's cause of death was multiple gunshot wounds, and the manner of death was homicide.

While investigating the shooting, Philadelphia Police Detective John Verrecchio received an anonymous tip that the shooter in this case had an Instagram account with the handle "@broad_day_kay." When Detective Verrecchio searched the handle on Instagram, it returned pictures of an individual he believed to be Phillips wearing floral shirts similar to the shirt worn by the assailant in the surveillance footage of the shooting. Roughly ten minutes after the shooting, this Instagram account made posts indicating that the owner of the account was just involved in a murder for hire.

On November 7, 2019, Detective Verrecchio and Detective Thomas Gaul conducted an interview of Phillips—who, at that time, was incarcerated on other charges—at the Philadelphia Police Department's Homicide Unit. The detectives sought to question Phillips concerning the shooting of Sadat and Williams as well as what they believed to be a retaliatory shooting where Phillips was the victim. After detectives read Phillips his **Miranda** rights and

he waived his right to remain silent, Phillips made several incriminating statements to the detectives, including admitting that he was the owner of the "@broad_day_kay" Instagram account and that he was involved in the shooting of Sadat and Williams.

Prior to trial, Phillips filed a motion to suppress his interview with Detectives Verrecchio and Gaul. *See* Motion to Suppress Statement, 12/28/2021. Phillips averred that the Detective Gaul violated his *Miranda* rights when, shortly after waiving his right to remain silent, he asked the detectives: "You all going to use this in court on me?" and Detective Gaul responded: "Nobody's using anything in court." Brief in Support of Motion to Suppress Statement, 3/22/2022, at 1-13. Phillips averred that Detective Gaul's statement violated *Miranda* because the statement was factually incorrect and directly contradicted *Miranda* because anything Phillips told police could, in fact, be used against him in court. *Id.* On April 25, 2022, the trial court held a hearing on the suppression motion, at the conclusion of which the court denied this aspect of the motion.[2]

---

[2] We note that the trial court did suppress a portion of Phillips' statement to police. Later in the interrogation, Phillips eventually requested a lawyer. N.T., 4/25/2022, Exhibit C-2 at 109. Although the detectives purported to stop their interrogation, they engaged in what they referred to as a "recap" of the interview with Phillips after he requested counsel. *Id.* The trial court determined that the "recap" after Phillips requested an attorney violated *Miranda* and must be suppressed. N.T., 4/25/2022, at 49-50.

On May 12, 2023, following trial,[3] a jury found Phillips guilty of the aforementioned crimes. The same day, the trial court sentenced Phillips to the mandatory term of life in prison without the possibility of parole on the first-degree murder conviction, and consecutive sentences of ten to twenty years in prison for attempted murder, two-and-a-half to five years each for PIC and carrying a firearm on the public streets of Philadelphia, respectively, and three-and-a-half to seven years for carrying a firearm without a license, for an aggregate sentence of life plus eighteen-and-a-half to thirty-seven years of incarceration. Additionally, the trial court found Phillips in contempt of court twice during the sentencing hearing because of disrespectful comments he made to the court and sentenced him to an additional three to six months in prison on each contempt conviction, to run consecutively to each other and to the other sentences. N.T., 5/12/2023, at 42-46. On May 19, 2023, Phillips filed a post-sentence motion, which the trial court denied on August 17, 2023.

Phillips timely appealed to this Court. Both the trial court and Phillips have complied with Pennsylvania Rule of Appellate Procedure 1925. Phillips presents the following issues for review:

> A. Whether the [trial court] erred as a matter of law and abused [its] discretion in admitting as evidence the testimony of interrogating officers and video of the interrogation where the interrogating officers made a promise of confidentiality to the

---

[3] This was Phillips' second trial. His first trial ended in a mistrial because of an outbreak Covid-19 among the jurors. *See* N.T., 5/4/2022, at 4-8.

[Phillips], violated the protections of **Miranda v. Arizona**, and induced [Phillips] to make an involuntary statement when at the 38:44 mark into the video interrogation [Phillips] asked the officers "You all going to use this in court on me?" that was answered by the officer "Nobody's using anything in court[]"?

B. Whether after sentencing [Phillips] to a life sentence without parole, the [trial court] erred in imposing a consecutive sentence of [eighteen-and-a-half to thirty-seven] years by declining a [presentence] investigation report requested by [Phillips], resulting in a record without any background, evidence of psychological impairments, history of trauma and/or character of [Phillips]?

Phillips' Brief at 12.

Phillips' first issue challenges the trial court's denial of his motion to suppress the statements he made during his interview with Detectives Verrecchio and Gaul. The standard of review for the denial of a suppression motion is well settled:

Our standard of review in addressing a challenge to the denial of a suppression motion is limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, we are bound by these findings and may reverse only if the court's legal conclusions are erroneous. The suppression court's legal conclusions are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts. Thus, the conclusions of law of the courts below are subject to our plenary review.

Moreover, appellate courts are limited to reviewing only the evidence presented at the suppression hearing when examining a ruling on a [pretrial] motion to suppress.

- 6 -

*Commonwealth v. Carey*, 249 A.3d 1217, 1223 (Pa. Super. 2021).

Phillips argues that the trial court erred in denying his suppression motion because Detective Gaul made statements to him that directly contradicted the *Miranda* warnings. *See* Phillips' Brief at 31-62. Specifically, Phillips takes issue with the following portion of his interrogation, which occurred after the detectives had informed him of his rights pursuant to *Miranda* and Phillips had signed a card waiving those rights:

> [Detective Gaul]: … Now, do you remember the day that you were shot? As far as [the] date?
>
> [Phillips]: Yeah, um. It was um, I went to Dorney Park that day, it was July, July 15th.
>
> [Detective Gaul]: [O]kay. And, like I said we're not asking you to sign a photograph or circle somebody's photograph or sign a statement, but who shot you?
>
> [Phillips]: (points to the camera). You all gonna use this in court on me?
>
> [Detective Gaul]: Nobody's using anything in court. Like I said, we're not here to try to railroad you or anything like that. What we're trying to do is like we talked about in the beginning. And even though it's kinda like an age old saying, as you go through life you can keep on making the same decisions and the same thing's going to keep on happening. All right. So at some point, at different times, you gotta be old enough to realize that you know what, maybe the same mistakes I'm making are the reason why I'm in the situation that I'm in ….
>
> [Phillips]: Yeah.

N.T., 4/25/2022, Exhibit C-2 (hereinafter "Interrogation Transcript") at 14-15.

Phillips argues that Detective Gaul's statement "Nobody's using anything in court" was in direct contravention to the *Miranda* warning that "anything you say can and will be used against you in a court of law." Phillips' Brief at 31. Phillips further asserts that this statement undermined his voluntary waiver of his *Miranda* rights, as it was an improper promise of confidentiality and that consequently, his statements, including his admission to participating in the shooting of Sadat and Williams, was inadmissible and subject to suppression. *Id.*

The law is clear that when an individual is in custody and subject to interrogation, that individual is entitled to *Miranda* warnings. *Commonwealth v. Yandamuri*, 159 A.3d 503, 520 (Pa. 2017) (citing *Miranda*, 384 U.S. at 478-79). Our Supreme Court has explained that under such circumstances, "before law enforcement officers question an individual" the officers "must first warn the individual that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed." *Id.* at 520-21 (citing *Miranda*, 384 U.S. at 478-79). The *Miranda* rights are rooted in the portion of the Fifth Amendment to the United States Constitution that protects individuals from

self-incrimination.[4]  *See Miranda*, 384 U.S. at 469.  Importantly, the rights set forth in the *Miranda* warnings persist throughout the entirety of an interrogation.  *Id.* at 473-74 ("If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease.").

With respect to the warning regarding the use of an individual's statements in court, the *Miranda* Court explained that the warning is necessary to explicitly inform the individual "not only of the privilege [against compelled self-incrimination], but also of the consequences of foregoing it." *Miranda*, 384 U.S. at 469.  The Court reasoned that "[i]t is only through an awareness of these consequences that there can be any assurance of real understanding and intelligent exercise of the privilege" and that "this warning may serve to make the individual more acutely aware that he is faced with a phase of the adversary system—that is he is not in the presence of persons acting solely in his interest." *Id.*

Additionally, the United States Supreme Court has stated that review into the adequacy of the waiver of *Miranda* rights is a two-part inquiry:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception.  Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the

---

[4]  We note that Phillps does not raise a separate claim under Article I, § 9 of the Pennsylvania Constitution, and we therefore limit our discussion to the suppression decision under the Fifth Amendment.

decision to abandon it. Only if the totality of the circumstances surrounding the interrogation reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

*Moran v. Burbine*, 475 U.S. 412, 421 (1986) (citation omitted); *see also Commonwealth v. Smith*, 210 A.3d 1050, 1058 (Pa. Super. 2019) (same).

Critically, the United States Supreme Court has recognized that statements or actions by police officers can undermine protections afforded by the *Miranda* warnings. *Miranda*, 384 U.S. at 476. Where there is evidence that demonstrates "that the accused was threatened, tricked, or cajoled into a waiver," then that "will, of course, show that the defendant did not voluntarily waive his privilege." *Id.*; *see also Colorado v. Spring*, 479 U.S. 564, 576 n.8 (1987) (observing that the Court had previously "found affirmative misrepresentations by the police sufficient to invalidate a suspect's waiver of the Fifth Amendment privilege") (citing *Lynumn v. Illinois*, 372 U.S. 528 (1963); *Spano v. New York*, 360 U.S. 315 (1959)). As stated by our Supreme Court:

> Promises of benefits or special considerations, however benign in intent, comprise the sort of persuasion and trickery which easily can mislead suspects into giving confessions. The process of rendering *Miranda* warnings should proceed freely without any intruding frustration by the police. Only in that fashion can we trust the validity of subsequent admissions, for if the initial employment of *Miranda* is exploited illegally, succeeding inculpatory declarations are compromised. Misleading statements and promises by the police choke off the legal process at the very moment which *Miranda* was designed to protect.

***Commonwealth v. Gibbs***, 553 A.2d 409, 411 (Pa. 1989).[5]

Additionally, when evaluating "the comprehensibility and efficacy of the ***Miranda*** warnings" we must do from the perspective of "a reasonable person in the suspect's shoes." ***Commonwealth v. Charleston***, 16 A.3d 505, 523 (Pa. Super. 2011) (quoting ***Missouri v. Seibert***, 542 U.S. 600, 602 (2004) (Souter, J., Opinion Announcing the Judgment of the Court)), ***abrogated on other grounds by In re L.J.***, 79 A.3d 1073 (Pa. 2013). Regardless of whether the police officer's conduct was intentional or inadvertent, the motive underlying the officer's conduct "is irrelevant to the question of the intelligence and voluntariness of [the accused]'s election to abandon his rights." ***Burbine***, 475 U.S. at 423. "Such conduct" by the interrogating officer "is only relevant to the constitutional validity of a waiver if it deprives a defendant of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them." ***Id.*** at 424.

Moreover, courts "will not pause to inquire in individual cases whether the defendant was aware of his rights" despite noncompliance with ***Miranda*** because "[a]ssessments of the knowledge the defendant possessed, based on information as to his age, education, intelligence, or prior contact with

_____

[5] "This pronouncement, applied in ***Gibbs*** to the right to counsel, was also intended by the ***Gibbs*** Court to extend to all of the rights elucidated in ***Miranda*** and subsequent derivative case law, including the right to remain silent." ***Commonwealth v. Morgan***, 606 A.2d 467, 469 (Pa. Super. 1992), ***aff'd***, 652 A.2d 295 (Pa. 1994) (per curiam).

authorities, can never be more than speculation; a warning is a clearcut fact." *Miranda*, 384 U.S. at 468-69 (footnote omitted). Thus, when analyzing the voluntariness of the waiver of *Miranda* rights or a confession, we must look only to the actual words of the interrogating officer and the understanding of a reasonable person standing in the accused's shoes, not to the motives or beliefs underlying the officer's conduct, nor can we speculate regarding the knowledge a suspect possessed about their rights. *See id.*; *see also Burbine*, 475 U.S. at 423.

The record in this case reflects that during their interrogation of Phillips, Detectives Verrecchio and Gaul initially discussed biographical information with him, asked him questions about his family, and then posed a few questions about the injuries Phillips sustained during the recent shooting. *See* Interrogation Transcript at 1-9. Detective Gaul then informed Phillips that they were going to be questioning him about the "various shootings that have been taking place all throughout the area where you were shot and we're not sure why you were shot as far as motive, you might have done something, you might not have done something," thus making Phillips aware they would be discussing more than just the incident during which he was shot and that the detectives believed he may have played a role in one or more of the other shootings. *Id.* at 10.

Immediately thereafter, Detective Gaul read Phillips his *Miranda* rights and Phillips signed a form waiving those rights. *Id.* After the detectives asked

Phillips more questions about his family, Detective Gaul asked Phillips who shot him. *Id.* at 10-14. It was at this point that Phillips pointed to the camera in the room and asked, "You all gonna use this in court on me?" to which Detective Gaul responded, "Nobody's using anything in court." *Id.* and 14. With that assurance, Phillips continued to speak with the detectives, and during the conversation that followed, he expressed his fear of retribution if he told the detectives who had shot him and ultimately provided critical information related to his involvement in the shooting of Sadat and Williams. *Id.* at 14-16, 92-100.

At the hearing on Phillips' suppression motion, Detective Gaul testified regarding Phillips' response to the question of who shot him:

Q.      [Phillips] pointed to the camera and said: "You all gonna use this in court on me?" When he said "this," what did you take him to mean? What did you take that question to mean when he was asking that?

                        *       *       *

A.      Based on my experience with shootings, you know, both nonfatal and fatal shootings and dealing with witnesses, my understanding from [Phillips'] response was the way he pointed to the camera and said "you all gonna use this in court," was that he was afraid that it would be -- this video would be getting out if he did identify who shot him. You know, that was how I took that, that he was concerned about his information getting out in court, that we -- everybody in this room, you know, I'm sure has seen that one of the biggest hurdles to get over is witness -- or actually victim intimidation. So that's what I took that as.

Q.      And when you said, "Nobody's using anything in court, bud, like I said, we're not here to try to railroad you or anything like that," what were you telling [Phillips] was not going to be used in court at that specific moment?

- 13 -

A. His identification. Like if he did come out and then say, you know, look, it was Kevin or whoever that shot him, you know what I mean, we weren't going to -- you know, at this point in the investigation, there was going to be other means that we could use to further the investigation, either through grand jury, indicting grand jury. We were trying to -- I was trying to actually put him at ease so he would keep talking at this point and tell us who shot him.

N.T., 4/25/2022, at 29-31.

In denying Phillips' motion to suppress the statements he made during his interrogation after Detective Gaul assured him his statement would not be used in court, the trial court explained:

> The [c]ourt found the testimony of Detective Gaul to be credible. [N.T., 4/25/2022,] at 48. The [c]ourt found that [Phillips] was given **Miranda** warnings, which he unequivocally waived. **Id.** The [c]ourt found that [Phillips] was treated well throughout the interview, and that no coercion took place. **Id.** With respect to Detective Gaul's statement that "[n]obody's using anything in court," the [c]ourt stated as follows:
>
>> I think it's very clear from the video that when Detective Gaul said nobody is using anything in court, he was clearly, unquestionably referring to [Phillips'] understandable concern about identifying somebody who shot him in the environment here in Philadelphia, where, as he eloquently described during the statement, often involves, including many people he personally knew, getting shot and killed. And that to me would not in any way violate the principles of **Miranda**. It did not imply that the statement would not be used against him. It implied that the statement would not be used against ... whomever it was who shot him. And that's an altogether different matter.
>
> **Id.** at 47. The [c]ourt found that no violation of **Miranda** occurred prior to [Phillips'] request for an attorney, and that [Phillips'] statement was voluntary. **Id.**

- 14 -

Trial Court Opinion, 12/12/2023, at 9.

We conclude that the trial court's decision is not supported by the record or the relevant law. The trial court's reasoning overlooks a significant aspect of Detective Gaul's answer to Phillips' direct question "You all going to use this in court **on me**?" *See* Interrogation Transcript at 14 (emphasis added). Phillips did not ask if the detectives were going to use any portion of his statement in court in general, he asked if they were going to use his statements in court **against him**. *See id.* Detective Gaul made no attempt to clarify the question, and instead he explicitly told Phillips that "Nobody's using **anything** in court" without any equivocation or qualification. *Id.* (emphasis added). To the contrary, Detective Gaul explained this assurance by telling Phillips that police were not there "to railroad" him but were exploring Phillips' actions that may have led to his own shooting. *Id.* In other words, the detectives were not out to get Phillips, they just wanted to know who shot him and what he did to cause someone to shoot him.

The plain meaning of Detective Gaul's actual words was that the detectives would not use anything that Phillips said in court against him. *See id.* This was a false, misleading, and empty promise of confidentiality. *See Gibbs*, 553 A.2d at 411. This is particularly true considering the detectives' frequent attempts to convince Phillips that they had his best interests in mind, referring to him as "bud" throughout the interview, telling him that they were trying to help him, and repeatedly telling him that they were not trying to

"railroad" him, including in the context of Detective Gaul's promise that nothing Phillips said was going to be used against him in court. *See, e.g.*, Interrogation Transcript at 10, 14, 16, 34, 79, 82, 84.

Phillips also did not express any concern about retribution prior to Detective Gaul assuring him "Nobody's using anything in court." *See* Interrogation Transcript at 14. Until that point, Phillips had only provided the detectives with biographical information and details about the injuries he had sustained when he was shot. *See id.* at 1-14. Phillips only expressed a fear of retribution and talked about people he knew getting shot in retaliation for talking to police **after** Detective Gaul stated, "Nobody's using anything in court." *See id.* at 14-16. Although Detective Gaul may have subjectively believed, based on his training and experience, that Phillips asked the question based upon his concern about retaliation for telling police who shot him, there is no support in the record for a finding that Phillips understood the assurance that nothing would be used against him in court to be limited to his identification of his assailant, especially in light of the clear and unambiguous language of both Phillips' question and Detective Gaul's response.

As the authority set forth above makes clear, the motives and beliefs underlying Detective Gaul's conduct is irrelevant when determining whether Phillips had voluntarily waived his rights pursuant to *Miranda*. *See Miranda*, 384 U.S. at 469-70; *Burbine*, 475 U.S. at 423. Rather, the relevant considerations are the actual words that Detective Gaul uttered and what a

reasonable person in Phillips' position would have understood regarding his rights under the totality of the circumstances. *See id.* In this case, the record reflects that almost immediately after the detectives read Phillips the *Miranda* warnings, including the warning that anything he said could be used against him in a court of law, Detective Gaul told Phillips, without qualification and in direct contravention to *Miranda*, "Nobody's using anything in court," detectives were not going to "railroad" him, and that they wanted to know about Phillips' actions that may have led to his own shooting. *See* Interrogation Transcript at 14. Indeed, it was not until after this assurance was made that Phillips made any inculpatory statements.

Based on the foregoing, we conclude that when Detective Gaul told Phillips "Nobody's using anything in court," he violated Phillips' rights under *Miranda*, invalidating his voluntary waiver of those rights, and that such violation required suppression of any statements Phillips made during the remainder of his interrogation. *See Spring*, 479 U.S. at 576 n.8 (recognizing that cases exist wherein the Court has found, even after proper *Miranda* warnings and a knowing, intelligent, and voluntary waiver, an interrogator may, through subsequent statements during the ensuing interrogation, subvert those warnings and thus invalidate the suspect's earlier waiver, requiring suppression of statements the suspect made thereafter during the interrogation); *Moran*, 475 U.S. at 426 (observing "the interrogation process is 'inherently coercive' and that, as a consequence, there exists a substantial

risk that the police will inadvertently traverse the fine line between legitimate efforts to elicit admissions and constitutionally impermissible compulsion") (citation omitted); *see also Hopkins v. Cockrell*, 325 F.3d 579, 585 (5th Cir. 2003) ("An officer cannot read the defendant his *Miranda* warnings and then turn around and tell him that despite those warnings, what the defendant tells the officer will be confidential and still use the resultant confession against the defendant."). The trial court therefore erred in denying Phillips' motion to suppress those statements.

We further conclude that such error was not harmless. "An error is harmless if it could not have contributed to the verdict, or stated conversely, an error cannot be harmless if there is a reasonable possibility the error might have contributed to the conviction." *Commonwealth v. Poplawski*, 130 A.3d 697, 716 (Pa. 2015). Harmless error occurs where:

> (1) the error did not prejudice the defendant or the prejudice was de minimis;
>
> (2) the erroneously admitted evidence was merely cumulative of other untainted evidence which was substantially similar to the erroneously admitted evidence; or
>
> (3) the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict.

*Id.* (citation omitted). "The Commonwealth has the burden of proving harmless error beyond a reasonable doubt." *Id.*

- 18 -

At the outset, we note that the Commonwealth did not argue harmless error in its brief before this Court. **See** Commonwealth's Brief at 9-18. Although we may raise the question of harmlessness sua sponte, **see Commonwealth v. Hamlett**, 234 A.3d 486, 492 (Pa. 2020), we cannot conclude that Phillips' confession could not have contributed to the verdict. During the interrogation, Phillips made numerous incriminating statements. Phillips told the detectives that he owned the Instagram account "@broad_day_kay," that he was at the scene at the time Sadat and Williams were shot, that he was paid $4,500 to serve as a lookout for his co-conspirators who he thought were going to commit a robbery during a drug transaction, and that his co-conspirators were getting paid $50,000. Interrogation Transcript at 92-100. Phillips' confession during the interrogation to playing an integral role in the criminal activity that resulted in Sadat's death resulted in his admission to the detectives that he participated in a conspiracy to commit murder. **See id.** As the United States Supreme Court has recognized:

> A confession is like no other evidence. Indeed, the defendant's own confession is probably the most probative and damaging evidence that can be admitted against him …. The admissions of a defendant come from the actor himself, the most knowledgeable and unimpeachable source of information about his past conduct. Certainly, confessions have profound impact on the jury, so much so that we may justifiably doubt its ability to put them out of mind even if told to do so.

**Arizona v. Fulminante**, 499 U.S. 279, 296 (1991); **see also Commonwealth v. Ardestani**, 736 A.2d 552, 557 (Pa. 1999) (Zappala, J.,

Opinion Announcing the Judgment of the Court) (same).  The evidence the Commonwealth submitted to the jury of Phillips' interrogation was, standing alone, sufficient to elicit a conviction of first-degree murder from the jury.

Prior to speaking with Phillips, the detectives believed Phillips was the owner of the "@broad_day_kay" Instagram handle, *see* N.T., 5/10/2023, at 103-04, but had no affirmative evidence that the account was his until he confirmed ownership during the interrogation.  Additionally, there was no eyewitness testimony at trial identifying Phillips as the shooter and the surveillance footage of the shooting was not of high enough quality for police to utilize facial recognition software to identify the shooter.  *Id.* at 102-03. Without the evidence the detectives obtained from the interrogation, the most incriminating evidence the Commonwealth had against Phillips was that he conducted internet searches on the day of the shooting for extended clips for 9mm handguns, and police recovered 9mm shell casings from the crime scene, N.T, 5/10/2023, at 164-66, and his cell phone pinged the cell tower in the vicinity of the crime scene around the time of the shooting.  N.T., 5/11/2023, at 40.

While this circumstantial evidence could support a finding of Phillips' guilt, it pales in comparison to the unequivocal evidence the detectives obtained during the interrogation.  Thus, we cannot say the erroneously admitted evidence was merely cumulative of other untainted evidence, nor can we say that the properly admitted evidence of guilt was so overwhelming

that the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict. **See Poplawski**, 130 A.3d at 716. Rather, the record reflects that there was, at the very least, a reasonable probability that the erroneously admitted evidence contributed to the verdict and Phillips was prejudiced by its admission. **See id.** We therefore cannot find that the admission of Phillips' confession was harmless error.

Accordingly, we must vacate Phillips' judgment of sentence and remand this matter to the trial court for a new trial.[6]

Judgment of sentence vacated. Case remanded. Jurisdiction relinquished.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 11/15/2024

---

[6] Based on our disposition of Phillips' first issue, we need not address his remaining issue challenging the discretionary aspects of his sentence.

- 21 -